Anne G. STUART, et al., Plaintiffs, Appellants,

v.

Francis M. ROACHE, as he is Police Commissioner of the City of Boston, et al., Defendants, Appellees.

No. 91–1483.

United States Court of Appeals, First Circuit.

Heard Sept. 5, 1991.

Decided Dec. 23, 1991.

Barbara A.H. Smith, with whom Regina L. Quinlan and Quinlan & Smith, Boston, Mass., were on brief for plaintiffs, appellants.

Jonathan M. Albano, with whom Marianne C. DelPo, Bingham, Dana & Gould, Alan J. Rom, and Lawyers Committee for Civil Rights Under the Law of the Boston Bar Ass'n, Boston, Mass., were on brief for defendant, appellee, Massachusetts Ass'n of Minority Law Enforcement Officers.

William W. Porter, Asst. Atty. Gen., with whom Scott Harshbarger, Attorney General, and Eleanor Coe, Asst. Atty. Gen., Boston, Mass., were on brief for defendant, appellee, Massachusetts Personnel Adm'r.

Before BREYER, Chief Judge, ALDRICH, Senior Circuit Judge, and SELYA, Circuit Judge.

BREYER, Chief Judge.

For the past eleven years the Boston Police Department, when promoting officers to the position of sergeant, has followed terms of a Consent Decree that require it to favor minority officers solely because of their race. The basic question on this appeal is whether, in light of a recent Supreme Court case, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), those Consent Decree terms remain legally binding. We conclude that *Croson* has not radically changed applicable preexisting law and that the Consent Decree remains legally valid.

# I

## Background

State law has long required the Boston Police Department (the Department) to follow a two-step process in promoting officers to the position of sergeant. First, officers who have served for three years may take a promotional examination. Those who pass the exam are placed on a promotion list, where they are ranked according to score. Mass.Gen.L. ch. 31, § 25. Second, the promoting official, the Police Commissioner, fills sergeant vacancies from this list of eligible officers, roughly according to rank order. To be more specific, the Commissioner follows a rule of "2n + 1," a rule that means that, if there are five sergeant vacancies (n = 5), the Commissioner fills them from the top 11 persons on the list ((2 × 5) + 1); if there are 15 vacancies, the Commissioner fills them from the top 31 persons on the list, and so forth. Mass.Gen.L. ch. 31, § 27; Personnel Administration Rule 9 (1988); Haley Aff. at 3.

In 1978 the Massachusetts Association of Afro–American Police, Inc. (MAAAP) sued the Boston Police Department claiming that Step One of its promotion system—the testing procedure—was biased against black officers. It argued that the tests, along with previous discrimination at the entry level, had created a virtually all-white cadre of sergeants. *Cf. Castro v. Beecher*, 334 F.Supp. 930 (D.Mass.1971), *aff'd in part and rev'd in part*, 459 F.2d 725 (1st Cir.1972) (finding that *entry-level* Police Department testing unlawfully discriminated against black applicants). The result of this discrimination, MAAAP said, was a Department where, in 1978, only one (or .45 percent) of 222 sergeants was black, although blacks comprised 5.5 percent of the roughly 2200 police officers in the force and 20 percent of the population of Boston as a whole.

In 1980, MAAAP and the Department settled their lawsuit. They entered into a Consent Decree in which (among other things) the Department promised to use only promotional tests specially validated as anti-discriminatory and fair. The Decree also says that the police "Commission-er shall make appointments to overcome any underutilization [of minorities] that may exist among sergeants in accordance with the goals set forth in Appendix B." Appendix B contains a Table entitled "Goals and Timetables." The Table sets forth a list (year by year) of the "projected number of sergeants," the "projected number of positions to be filled," and a set of related "goals" for the number of black sergeants in the Department. These goals, if achieved, would have meant 25 black sergeants by the year 1985, creating a Department with about 9 percent black sergeants. *See* Consent Decree, Appendix B. The Appendix also states that "the Department is to make a good faith effort to reach these goals." The Decree, by its terms, was to expire in 1985.

During the Decree's initial life—between 1980 and 1985—the Department failed to give any "validated-fair" examinations, and it failed to meet the Consent Decree's numerical goals. As a result, MAAAP successfully petitioned the court to extend the Decree's life until 1990 and to modify its "Goals and Timetables" to reflect the increasing number of qualified blacks in the Department. Between 1985 and 1990, the Department successfully administered one "validated-fair" examination. The number of blacks promoted during this time, however, still fell short of the Decree's numerical goals. Thus, in 1990, at MAAAP's and the Department's joint request, the court extended the Decree once more, until the Department gave one additional "validated-fair" examination—an examination that the Department had scheduled for later this year. Since the parties expected that, by December 1991, nearly 20 percent of promotion-eligible officers would be black, the court revised the Decree's numerical goal to 40, or 15.5 percent, of the Department's sergeants.

In October 1990, thirty-four white police officers filed this action against the Boston Police Department. The plaintiffs complain, and the Department concedes, that the Commissioner did not appoint them to the rank of sergeant, that they had higher test scores than a number of black officers

whom the Commissioner did appoint to the rank of sergeant, that the scores of at least some of the promoted black officers placed those black officers below the ("2n + 1") civil service rule cut-off point that would have prevented their appointment in the absence of the Consent Decree, and that (in the Commissioner's words) the white plaintiffs "were all passed over because of ... compliance with the consent decree." Roache Dep. at 25. The plaintiffs argue that the law clearly would prohibit this type of "race-conscious" promotion in the absence of the Consent Decree. And, they add that, in light of *Croson,* the Decree is powerless to authorize or to require such discrimination.

The district court, after reviewing past and present Supreme Court opinions in this area, concluded that the Decree is lawful and may compel this kind of race-conscious activity as a remedial measure, correcting prior anti-black discrimination. The plaintiffs have appealed, asking us to re-examine the legality of the Decree in light of the *Croson* decision.

## II

### *The Legality of the Decree*

 The Consent Decree at issue classifies police officers according to race. It provides benefits based upon race. The Supreme Court has made clear that any court, in deciding whether such a classification is lawful, must subject it to "strict scrutiny." *See Croson,* 488 U.S. at 494, 109 S.Ct. at 721 (plurality of four Justices) ("reaffirm[ing] the view expressed by the plurality in *Wygant* [*v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986)] that the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification"); *id.,* 488 U.S. at 519, 109 S.Ct. at 735 (Kennedy, J., concurring in part and concurring in the judgment) ("accept[ing] ... rule contained in Justice O'Connor's opinion"); *id.* at 520, 109 S.Ct. at 735 (Scalia, J., concurring in the judgment) ("agree[ing] ... that strict scrutiny must be applied to all governmental classifica-

tion by race, whether or not its asserted purpose is 'remedial' or 'benign' "); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 279–80, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986) (plurality); *id.* at 285–86, 106 S.Ct. at 1852–53 (O'Connor, J., concurring in part and concurring in the judgment).

Although different members of the Court have described differently what they believe "strict scrutiny" means, *see Croson,* 488 U.S. at 518–19, 109 S.Ct. at 734–35 (Kennedy, J., concurring in part and concurring in the judgment) (contrasting strict scrutiny standard of plurality with that of Justice Scalia), we believe a majority of the Court has concluded that the standard requires us to make certain that any race-conscious relief is justified by a "compelling state interest," *see, e.g., id.* at 505, 109 S.Ct. at 727, and that any such relief is "narrowly tailored" to further that interest. *Id.* at 507–08, 109 S.Ct. at 728–29. *See also United States v. Paradise,* 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality) (setting out both parts of strict scrutiny test); *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847 (plurality) (same); *id.* at 285, 106 S.Ct. at 1852–53 (O'Connor, J., concurring in part and concurring in the judgment) (same). The Court has also accepted an equally important proposition, namely that a compelling state interest "unquestionably" exists where a race-conscious employment program "remed[ies] past and present discrimination by a state actor." *Paradise,* 480 U.S. at 167, 107 S.Ct. at 1064 (plurality). *See also Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847 (plurality) (to justify racial classification, need "showing of prior discrimination by the governmental unit involved"). In light of these propositions, the race-conscious relief before us is lawful if it represents a "narrowly tailored" effort to remedy past Police Department discrimination against minority groups.

### A

#### *Compelling Interest*

 As we read the relevant Supreme Court opinions, the basic question before

us is an evidentiary issue: Is there a *"strong basis in evidence"* for the conclusion that the Consent Decree here at issue serves a remedial purpose with respect to past discrimination? *Croson,* 488 U.S. at 500, 109 S.Ct. at 724, quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849 (emphasis added). We recognize that, at one point, Justice Powell may have suggested a stronger evidentiary standard. In a well-known plurality opinion, he wrote that "judicial, legislative, or administrative *findings* of constitutional or statutory violations" may be necessary to trigger a governmental interest in remedying past discrimination. *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978) (emphasis added). Justice Powell, however, later wrote in support of a less strict standard, authorizing race-conscious relief where the public entity had a *"strong basis in evidence* for [the] conclusion that remedial action was necessary." *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849 (plurality) (emphasis added). *See also id.* at 289, 106 S.Ct. at 1855 (O'Connor, J., concurring in part and concurring in the judgment) ("agree[ing] with the plurality that a contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite"). A majority of the Supreme Court in *Croson* used the words "strong basis" and "prima facie case" in this context. *Croson,* 488 U.S. at 500, 109 S.Ct. at 724, quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849 (plurality). *See also Wygant,* 476 U.S. at 292, 106 S.Ct. at 1856 (O'Connor, J., concurring in part and concurring in the judgment). Hence, that is the evidentiary standard that we use.

In this case, the record provides "strong evidence" that the race-conscious relief in the Consent Decree serves a proper remedial purpose. For one thing, the Consent Decree itself recites figures that would appear to make out a "prima facie" case of unlawful discrimination in the promotion of black officers. For example, the Decree points out that, at the time MAAAP filed its complaint (March 2, 1978), only one of 222 sergeants in the Boston Police Department was black, yet approximately 72 black officers were eligible for promotion. The relevant percentages—0.45 percent black sergeants in a Department with 4.5 percent eligible black police officers—would seem to make out a prima facie case of discrimination under "disparate impact" analysis as applied by many courts. *Cf. Hazelwood School Dist. v. United States,* 433 U.S. 299, 308 n. 14, 311 n. 17, 97 S.Ct. 2736, 2742 n. 14, 2743 n. 17, 53 L.Ed.2d 768 (1977); *Castaneda v. Partida,* 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Peightal v. Metropolitan Dade County,* 940 F.2d 1394, 1406 (11th Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 969, — L.Ed.2d — (1992). Undisputed figures in the complaint, describing 1970s tests and their results, would strengthen the case.

Plaintiffs contend that the statistical disparities in the Department cannot be sufficient to justify an affirmative action plan because the Supreme Court in *Croson* found that even greater disparities did not constitute "strong" or "firm" evidence of prior discrimination. Plaintiffs, however, misinterpret the *Croson* Court's rationale for dismissing the significance of the statistical evidence in that case.

In *Croson,* the Richmond City Council adopted a set-aside program that "required prime contractors to whom the city awarded construction contracts to subcontract at least 30 percent of the dollar amount of the contract" to minority businesses. *Croson,* 488 U.S. at 477, 109 S.Ct. at 712. The trial court found that the set-aside program was appropriate because, among other things, "minority businesses received .67 percent of prime contracts from the city while minorities constituted 50 percent of the city's population." *Id.* at 499, 109 S.Ct. at 724. The Supreme Court rejected this rationale. It did *not* do so, however, because the gross disparity suggested by the statistics was insufficiently large. Rather, the Court did so because of the way in which the Council had compared minority participation in the construction industry with general population figures. While acknowledging that "gross statistical disparities" may alone constitute prima facie proof of prior discrimination, *id.* at 501, 109 S.Ct. at 725, the Court declared that

"where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities *qualified* to undertake the particular task." *Id.* at 501–02, 109 S.Ct. at 725 (emphasis added). The Court noted that, "[i]n this case, the city does not even know how many [minority enterprises] in the relevant market are qualified to undertake prime or subcontracting work in public construction projects." *Id.* at 502, 109 S.Ct. at 725. More generally, where special qualifications are relevant, a comparison to general population figures will not tend to show past discrimination by the specific governmental unit involved, for it may just as well reflect "past societal discrimination in education and economic opportunities...." *Id.* at 503, 109 S.Ct. at 726. And, as the Court has repeatedly warned, societal discrimination alone is too amorphous a basis upon which to justify a racially classified remedy. *Id.* at 505–06, 109 S.Ct. at 727; *Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848 (plurality); *Bakke,* 438 U.S. at 307, 98 S.Ct. at 2757 (plurality).

In the present case, however, the "comparison" figures do not appear to reflect simply general "societal" discrimination. The Decree compares the number of black sergeants, not with the Boston population in general, but with those police officers with the minimal qualifications needed to become sergeants. The fact that, of the latter pool, 4.5 percent of the officers are black, as opposed to .45 percent who became sergeant, at least casts doubt on the fairness of the promotion process and requires further explanation. *Wygant,* 476 U.S. at 293, 106 S.Ct. at 1857 (O'Connor, J., concurring in part and concurring in the judgment) (when the public employer "introduces its statistical proof as evidence of its remedial purpose, thereby supplying the court with the means for determining that [the employer] had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the nonminority [employees] to prove their case; they continue to bear the ultimate burden of persuading the court that the ... evidence did not support an inference of prior discrimination...."). 

Plaintiffs, in an effort to discredit these numbers, point out that the Department selects its police sergeants from among those officers who *pass* the sergeants' examination. They suggest that the pool of qualified applicants (against which the small number of black sergeants are measured) consequently should have been those who *passed* the examination, not those who *took* it. However, to treat the former group as the "pool of eligibles" would assume that the examination was a fair non-discriminatory device for screening applicants. And, it is just this assumption that the tiny percentage of black sergeants (measured against the larger percentage of eligible black examination-*takers*) calls into question. MAAAP, in its original complaint, charged that the examination itself discriminated unfairly, pointing out, for example, that pass rates for blacks who took the examination were, in 1974 and in 1977, 62 percent and 28 percent of pass rates for whites.

The very purpose of "disparate impact" analysis is to use a numerical comparison that will help identify a possibly unfair, discriminatory hurdle interposed between the eligible minority applicant and success. *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). To choose both "pool of eligibles" and "successful applicants" from the far side of the hurdle would destroy the point of the analysis; and the law does not require courts to do so. *See, e.g., Powers v. Alabama Dep't. of Educ.,* 854 F.2d 1285, 1297 (11th Cir.1988) ("By requiring that the plaintiffs [in a disparate impact suit] limit their comparison pool to only those blacks who had been certified [for advancement], the district court simply begged the question."), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989).

Plaintiffs also argue that the pool of eligible officers should be made up of those who actually applied for promotion, not just those who were eligible on paper. They have presented no evidence, however, either here or in the district court, that doing so would make any significant difference. We have no reason to believe that the percentage of eligible officers who would ask for promotion would differ by

race. Thus, unlike *Croson*, the numbers mentioned in the Decree make out a plausible prima facie case of unlawful discrimination.

For another thing, the Decree refers to *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972), a litigated case that suggests a different, obvious, and perhaps more important reason why the Boston Police Department had only one black sergeant in 1978. In *Castro*, this court affirmed a lower court finding that the Department discriminated against black applicants in its hiring practices, through the use of entry-level testing procedures that improperly favored white applicants. The result, as of 1970, was a Police Department with just over 2 percent of its officers black or hispanic, in a city where these minority groups comprised 16 percent of the total population. Obviously, if few blacks become police officers, few blacks will become sergeants.

*Castro* required the Department to begin, in the early 1970s, to remedy this situation by instituting efforts to hire a greater number of black officers. Yet remedial action takes time, and discrimination may linger for many years in an organization that had excluded blacks from its ranks. As we have said, by the end of the 1970s, approximately 5.5 percent of the police force was black, but only 4.5 percent of those officers with three years of experience and 2.6 percent of those with seven years of service were black. The Consent Decree itself indicates that experience matters. While an officer must have served three years in order to apply to become a sergeant, successful applicants had served an average of seven or more years in the police force.

One obvious reason, then, why there may have been few black sergeants in the Boston Police Force in 1978 is that the Department had not hired many black police officers before 1970. Since unjustified discrimination accounted for the latter fact, the latter fact cannot excuse the former. *See Paradise*, 480 U.S. at 168–69, 107 S.Ct. at 1065 (plurality) (where "[d]iscrimination at the entry level necessarily precluded blacks from competing for promotions, and resulted in a departmental hierarchy dominated exclusively by non-minorities.... [the Department cannot] segregate the results achieved by its hiring practices and those achieved by its promotional practices"). *See also Powers*, 854 F.2d at 1299 (relative inexperience of black employees will not rebut showing of disparate impact where it is likely "that racial discrimination itself was responsible for the difference in blacks' and whites' lengths of service"); *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1168 (5th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976); *cf. Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st. Cir.1988) ("employer can be placed under a higher burden ... upon a showing of past discrimination"). Indeed, litigated court findings of recent entry-level discrimination would seem sufficient to justify race-conscious remedies at both entry and promotional levels. *See, e.g., Higgins v. City of Vallejo*, 823 F.2d 351 (9th Cir.1987) (1982 affirmative action program supported by 1973 state agency finding of discrimination and racial imbalance in municipal workforce), *cert. denied*, 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989); *Fountain v. City of Waycross*, 701 F.Supp. 1570, 1577 (S.D.Ga.1988) (statistical evidence unnecessary where direct and uncontroverted evidence that Department engaged in a pattern of discrimination against blacks 8 years ago).

In sum, if we look only to the Decree itself and an earlier litigated case, we find (1) numbers that make out a "disparate impact;" (2) a past history of entry-level discrimination; (3) allegations of unfair, discriminatory promotional examinations; and (4) no significant effort by the Department or the plaintiffs, here or earlier, to rebut the natural inference of discrimination arising from the first three of these circumstances. These four factors provide a "strong" or "firm" basis in evidence of prior discrimination. And, that discrimination, in turn, demonstrates a "compelling purpose" for race-based relief. *Wygant*, 476 U.S. at 277–78, 106 S.Ct. at 1848–49 (plurality); *id.* at 292–93, 106 S.Ct. at 1856–

57 (O'Connor, J., concurring); *Croson,* 488 U.S. at 500, 109 S.Ct. at 724 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849).

█ Plaintiffs, in a heroic effort to overcome the force of these considerations, argue that the Consent Decree itself forbids us to take account of some, or all, of them. The Decree contains a disclaimer of liability, which states:

> The consent of the parties shall in no manner constitute findings on the merits in this action, nor shall it be construed as an admission by the defendants of any violation ... nor shall it be construed as an admission by the defendants to any of the matters in the complaint filed in this action.

Plaintiffs argue that this disclaimer precludes defendants from introducing, and the court from considering, at least statistical evidence of disparities found in the Decree.

However, that is not what the disclaimer says. The disclaimer simply precludes the Decree's use as an "admission" of liability, or as an "admission" of the facts and violations *mentioned in the complaint.* It does not say that it precludes litigation by others. It does not say that it applies to facts agreed to in the Decree itself. Nor does it say that the Department may not subsequently admit to the same facts for other purposes (which they have done in the case before us). Indeed, to read the disclaimer more broadly, as permanently barring the parties from relying on the facts cited in the Decree, would effectively prevent the signatories from defending the Decree against third party challenges. Such an interpretation would conflict with the express wording of the Decree (requiring the parties to repel such challenges) and with the intent of the parties in adopting the remedial plan. It is not surprising that courts, in roughly comparable cases, have uniformly stated that a disclaimer will not bar the consideration of evidence of past discrimination introduced in the action. *See generally Donaghy v. City of Omaha,* 933 F.2d 1448, 1460 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 938, — L.Ed.2d — (1992); *Howard v. McLucas,* 871 F.2d 1000, 1008 (11th Cir.), *cert. de-*

*nied,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989); *Kirkland v. New York State Dep't. of Correctional Servs.,* 711 F.2d 1117, 1131 n. 16 (2d Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984); *Stotts v. Memphis Fire Dept.,* 679 F.2d 541, 553 n. 10 (6th Cir. 1982), *rev'd on other grounds sub nom. Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *United States v. City of Alexandria,* 614 F.2d 1358, 1364–65, 1365 n. 15 (5th Cir.1980); *United States v. City of San Francisco,* 656 F.Supp. 276, 285 n. 9 (N.D.Cal.1987); *EEOC v. American Tel. & Tel. Co.,* 419 F.Supp. 1022, 1038 n. 16 (E.D.Pa.1976), *aff'd,* 556 F.2d 167 (3d Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978). We can find no reason to depart from this authority.

Our reading of the disclaimer's effect, of course, does not prevent the parties in a reverse discrimination suit such as this one from offering additional evidence in support of, or in opposition to, the specific facts mentioned in the Decree. But, the plaintiffs, when opposing the defendant's summary judgment motion, did not point to any such evidence. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). To the contrary, in their own motion for summary judgment, plaintiffs said, "there is no genuine issue as to any material fact," and professed to "rely," among other things, on the Consent Decree for support.

**B**

*Narrow Tailoring*

█ Any race-based remedy for prior discrimination must also be "narrowly tailored to the achievement of that goal." *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1846–47 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 480, 100 S.Ct. 2758, 2776, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.)). The following features of the relief at issue convince us that the relief meets this requirement.

First, the pool of minority officers benefitting from the relief is the qualified pool of those who have passed civil service examinations validated as fair and non-discriminatory. *See Paradise*, 480 U.S. at 177–78, 107 S.Ct. at 1070 (plurality) (appropriate relief where qualified applicants promoted and where Department not obligated to make unnecessary or gratuitous promotions).

Second, the promotional goals contained in the Decree are linked to the size of the relevant qualified labor pool. *See Paradise*, 480 U.S. at 187, 107 S.Ct. at 1074 (Powell, J., concurring) (in determining whether remedy is narrowly tailored, a court may examine "the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force"); *id.* at 199, 107 S.Ct. at 1081 (O'Connor, J., dissenting). *See also Croson*, 488 U.S. at 507, 109 S.Ct. at 728 (criticizing plans based on general population figures under second prong of strict scrutiny). Indeed, the goals fall short of the projected number of black officers eligible for promotion. For example, as projected, the 1991 goal for black sergeants amounts to 15.5 percent of all sergeants, while the eligible pool contains about 20 percent black officers.

Third, the Commissioner, in promoting from the list of those who have passed the examination, gives only limited advantage to minority officers, increasing the number of black sergeants gradually over time. The Decree sets as its original "goal" the promotion of 5 blacks to sergeant out of a projected 24 promotions available in 1981; the promotion of 7 blacks to sergeant out of a projected 35 promotions available in 1985; and so forth. The revised "Timetables and Goals," as entered by the district court in 1990, sets as a "goal" the promotion of 13 blacks to sergeant out of a projected 58 promotions available in 1991. Thus, the Decree limits only to a rather small extent the ability of white police officers to become sergeants. Indeed, white officers passed over on one test may be considered for future appointments. *See Johnson v. Transportation Agency, Santa Clara County, Cal.*, 480 U.S. 616, 638, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987) ("[D]enial of the promotion unsettled no legitimate, firmly rooted expectation on the part of petitioner. Furthermore, while the petitioner in this case was denied a promotion, he retained his employment with the Agency, at the same salary and with the same seniority, and remained eligible for other promotions."); *Higgins*, 823 F.2d at 360 ("Like hiring goals, promotion guidelines visit a minor burden on nonminority employees. But unlike hiring goals, promotion guidelines do not require that an individual bear the burden of past discrimination to the extent that he or she is denied a livelihood.").

Fourth, the Decree is limited in time and will likely terminate sometime next year. *Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 479, 106 S.Ct. 3019, 3051, 92 L.Ed.2d 344 (1986) (plurality) (remedial goals should be temporary); *Paradise*, 480 U.S. at 178, 107 S.Ct. at 1070 (goals are ephemeral, contingent on Department's conduct); *Fullilove v. Klutznick*, 448 U.S. 448, 513, 100 S.Ct. 2758, 2792–93, 65 L.Ed.2d 902 (1980) (Powell, J., concurring) (temporary nature ensures "that a race-conscious program will not last longer than the discriminatory effects it is designed to eliminate"). Plaintiffs point out that the Decree has been extended twice since its original expiration date in 1985, and it could be extended further. But strong reasons supported the extensions. As of 1985, the Department had failed to give the "validated-fair" examinations called for by the Decree. By 1990, the Department had given only one such examination and had failed to meet the Decree's goals. In 1990, the Department was planning for its second "validated-fair" examination in ten years, an examination that was to take place in 1991. That fact, along with the changing racial composition of the police force, made a brief extension and somewhat revised goals appropriate. *Cf. Sheet Metal Workers*, 478 U.S. at 478, 106 S.Ct. at 3051 (plurality); *id.* at 487–8, 106 S.Ct. at 3056 (Powell, J., concurring in part and concurring in the judgment); *Paradise*, 480 U.S. at 178 & n. 29, 107 S.Ct. at

1070 & n. 29 (plurality). The Decree "is not being used simply to achieve and maintain racial balance, but rather as a benchmark against which the court could gauge ... efforts to remedy past discrimination." *Sheet Metal Workers,* 478 U.S. at 477–78, 106 S.Ct. at 3050–51; *Johnson,* 480 U.S. at 639, 107 S.Ct. at 1455 (decree intended only to *"attain* a balanced workforce, not to maintain one")*; United Steelworkers v. Weber,* 443 U.S. 193, 216, 99 S.Ct. 2721, 2734, 61 L.Ed.2d 480 (1979) (Blackmun, J., concurring).

Fifth, the Decree explains why alternative, racially-neutral relief alone would likely prove inadequate by describing how the Department's efforts in the 1970s failed to produce fair testing procedures or reduce the impact of seniority on promotion. *See Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066 (plurality) ("In determining whether race-conscious remedies are appropriate, we look to several factors, including the ... efficacy of alternative remedies."); *Croson,* 488 U.S. at 507, 109 S.Ct. at 728; *Wygant,* 476 U.S. at 280 n. 6, 106 S.Ct. at 1850 n. 6 (plurality). The Consent Decree, as a result, included the minority training and education programs that the plaintiffs advocate, as well as the relief now before us.

In sum, the race-conscious relief here at issue represents a narrowly tailored effort, limited in time, to overcome the effects of past discrimination. As such, it is lawful. *Paradise,* 480 U.S. at 185–86, 107 S.Ct. at 1073–74 (plurality); *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847 (plurality). And, the efforts in favor of eligible black police officers that it mandates therefore do not violate any statute or the Constitution of the United States.

### III

#### Other Arguments

■ The plaintiffs make two additional legal claims. First, they argue that state law granted them a "property right" to a promotion; and that to deny them a promotion without a hearing deprives them of their "property, without due process of law." U.S. Const. amend. XIV, § 1.

*Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). We have previously held, however, that, where an appointing authority may consider factors in addition to the applicant's ranking on an eligibility list, a police officer's expectation of promotion based on that list will not rise to the level of a "property interest" entitled to constitutional protection. *Burns v. Sullivan,* 619 F.2d 99, 104 (1st Cir.) (police officer does not possess property right in promotion based on written examination scores), *cert. denied,* 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980). *Cf. Callanan v. Personnel Adm'r for the Commonwealth,* 511 N.E.2d 525, 528 (Mass.1987); *McCue v. Director of Civil Service,* 91 N.E.2d 761, 763 (Mass.1950). Since the eligible officers do not have a "property right" in promotions, the Fourteenth Amendment consequently does not offer them procedural protections. *Roth,* 408 U.S. at 578, 92 S.Ct. at 2709–10; *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985), *Bishop v. Wood,* 426 U.S. 341, 347, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).

■ Second, plaintiffs argue that the Commissioner's race-conscious promotion policy amounts to intentional racial discrimination and thereby violates 42 U.S.C. § 1981 (providing "equal rights under the law" for all persons within United States). For the reasons set forth in Section II of this opinion, however, we find that the race-based relief was justified by a compelling state interest and narrowly tailored to serve that interest. Since a valid remedial plan provides a legitimate nondiscriminatory basis for race-based employment decisions, plaintiffs' § 1981 claim must also fail. *Boston Chapter, NAACP v. Beecher,* 679 F.2d 965, 976 (1st Cir.1982) (race-conscious relief permissible under § 1981 and § 1983, as well as Title VII), *vacated on other grounds sub nom. Boston Firefighters Union, Local 718 v. Boston Chapter, NAACP,* 461 U.S. 477, 103 S.Ct. 2076, 76 L.Ed.2d 330 (1983) (per curiam). *See also Setser v. Novack Inv. Co.,* 657 F.2d 962,

966–67 (8th Cir.1981) (en banc) (race-conscious plans to remedy past discrimination not barred by § 1981) (citing cases); *Edmonson v. United States Steel Corp.*, 659 F.2d 582, 584 (5th Cir.1981). *Cf. Johnson*, 480 U.S. at 626–27, 107 S.Ct. at 1449 ("existence of an affirmative action plan provides [a nondiscriminatory] rationale" for race-conscious promotions and a valid defense to Title VII reverse discrimination claim); *Paradise*, 480 U.S. at 167, 107 S.Ct. at 1064 (plurality) (upholding race-conscious relief against Equal Protection challenge); *Sheet Metal*, 478 U.S. at 479–80, 106 S.Ct. at 3052 (plurality) (same).

For these reasons, the judgment of the district court is

*Affirmed.*

APPENDIX

BOSTON POLICE DEPARTMENT

GOALS AND TIMETABLES: BOSTON POLICE SERGEANT

| Date | Projected No. Of Sergeants | Projected No. Of Positions To Be Filled | Projection of Blacks As A Percentage Of Patrol Officers With 3 Years In Grade * | Projection of Blacks As A Percentage Of Patrol Officers With 7 Years In Grade ** | GOALS | |
|---|---|---|---|---|---|---|
| | | | | | No. of Black Sergeants *** | Blacks As A Percentage Of Sergeants |
| July 1980 | 228 | 25 | 4.4 | 2.6 | 3 | 1.3 |
| Dec. 1981 | 242 | 24 | 7.1 | 3.4 | 8 | 3.2 |
| Dec. 1982 | 270 | 35 | 7.0 | 4.6 | 13 | 4.8 |
| Dec. 1983 | 270 | 30 | 12.6 | 4.4 | 18 | 6.7 |
| Feb. 1985 | 270 | 35 | 14.6 | 6.9 | 25 | 9.2 |

* Three years in grade as a patrol officer is a requirement for promotion to sergeant.

** It has been the experience of the Department that those officers actually promoted to sergeant have had 7 years in grade as patrol officers.

*** Includes sergeants who serve in higher, non–Civil Service positions.

The figures in these Goals and Timetables do not reflect unanticipated attrition.

---

BOSTON POLICE DEPARTMENT

GOALS AND TIMETABLES: BOSTON POLICE SERGEANT

| DATE | NO. OF SERGEANTS | NO. OF POSITIONS TO BE FILLED | BLACKS AS A PERCENTAGE OF PATROL OFFICERS WITH THREE YEARS EXPERIENCE | NO. OF BLACK SERGEANTS | BLACKS AS A PERCENTAGE OF SERGEANTS |
|---|---|---|---|---|---|
| September 1990 | 213 permanent plus 45 acting or provisional appointments | 0 | 17.31 (or 210 black officers of a total of 1213) | 27 permanent plus 8 acting or provisional appointments | 12.68 |
| December 1991 | 200 | 58 (replace 45 provisional appointments and fill 13 retirement positions) | 19.56 (or 284 black officers of a total of 1452) | 40 | 15.50 |