LIPEZ, Circuit Judge, dissenting.
The majority frames the critical issue as one involving “competing interpretations of the term firefighter.” I respectfully disagree that this is the central issue in the dispute. Indeed, the majority attributes an argument to the Candidates that they have not made in this litigation — that the court and the parties to the Beecher decree understood as a matter of original intent that minority presence in the fire departments subject to the decree would be calculated by considering only the entry-level firefighter rank. The Candidates acknowledge that “[w]hen the Beecher decree was originally conceived, its apparent goal was to generate racial parity in the Fire Department as a whole, as opposed to merely the firefighter ranks.” Instead, the Candidates argue that we should focus only on the entry-level ranks because changed circumstances since 1974 and 1992, when we last reviewed the Beecher decree in Mackin v. City of Boston, 969 F.2d 1273 (1st *40 Cir.1992), render the original intent of the decree unconstitutional.
Moreover, even if the Candidates had asked us to determine the original intent of the parties on the calculation of parity, it is a mistake to frame the issue as a search for the meaning of the term “firefighter.” As I will explain in more detail, there is no consistent use of the word “firefighter” as the operative term in the calculation of parity. Instead, there are a variety of terms used, only one of which is the word “firefighter.” The relevant question, then, is which of the early formulations of the measurement of parity captures the intent of the parties and the court.
This dissent proceeds in three parts. In part I, I address the majority’s conclusion that the Beecher decree always contemplated that the first variable, to use the majority’s language, would only consider the percentage of minorities in the entry-level firefighter ranks. In Part II, I address the majority’s assertion that narrow tailoring requires this interpretation of the decree to avoid constitutional problems. In Part III, I evaluate the Candidates’ argument that changed circumstances since the entry of the Beecher decree require that the decree now be read to measure parity by focusing only on the firefighter ranks.
I. Interpreting the Decree
In the original Beecher decree issued on February 8, 1974, the court used the phrase “complement of minorities” in the operative sentence explaining when a city’s fire department could receive an exemption.[11] Boston Chapter, NAACP, Inc. v. Beecher, 371 F.Supp. 507, 523 (D.Mass.), aff'd 504 F.2d 1017 (1st Cir.1974). In its Interim Consent Decree of April 17, 1975 (signed by the parties), the court for the first time used the term “firefighter” in explaining the process for obtaining an exemption: “The Director [of Personnel Administration] shall notify the plaintiffs and supply evidence to the plaintiffs whenever a particular city or town has achieved a complement of Black and Spanish-sur-named firefighters commensurate with the percentage of minorities within the community .... ” Boston Chapter, NAACP, Inc. v. Beecher, No. 72-3060-F, slip op. at 4 (D.Mass. Apr. 17, 1975) (emphasis added). Soon thereafter, though, the parties signed the “Agreement to Effectuate Interim Consent Decree,” which again discusses exemptions. Paragraph 11 of that Agreement states: “No fire department ... may be exempted ... unless the appointing authority has first petitioned the Division that the percentage of post-probationary minority uniformed personnel equals the percentage of minorities in the city or town served by said department .... ” Boston Chapter, NAACP, Inc. v. Beecher, No. 72-3060-F, slip op. at 6 (D.Mass. Nov. 25, 1975) (emphasis added).[12]
*41 Presented with these three formulations, the majority chooses to focus on the word “firefighter” in the April 1975 Interim Consent Decree as the critical word and dismisses the formulation in the final agreement of the parties (“the percentage of post-probationary minority uniformed personnel”) as a “casual (and wholly unexplained) linguistic switch.” This dismissive characterization seems odd, especially since the phrase “post-probationary minority uniformed personnel” in the November 1975 Agreement is far closer to the general language of the original Beecher decree (“complement of minorities”) than the word “firefighter” used in the April Interim Decree. The “complement of minorities” and “post-probationary minority uniformed personnel” formulations also seem to capture the purpose that the Beecher court attributed to its own decree — to remedy the “exclusion of minorities from the fire department” — than does the word “firefighter.” Beecher, 371 F.Supp. at 519-20.
However, there is support for competing views in the shifting word choices of these three decrees. The language itself does not tell us definitively what the court and parties intended for the measure of the first variable. But the use of the word “firefighter” is part of the ambiguity — not the answer to it. In the sequence of language in the three decrees, there is no basis for concluding that “firefighter” is the operative word and that determining its plain meaning will answer the intent question.[13] Instead, we must acknowledge that the competing formulations of the first variable create an inescapable ambiguity which must be resolved by resort to extrinsic evidence.
We have already opined in this litigation on the kind of persuasive evidence that helps resolve such ambiguities. “Few things evidence a decree’s meaning more persuasively than [a] ... pattern of past practice under the decree .... ” Mackin, 969 F.2d at 1276. The City and the NAACP produced evidence that Massachusetts has required municipalities seeking exemptions from the decree to compare the percentage of minorities in the population of their city or town to the percentage of minority personnel among their departments’ entire uniformed 'personnel. Using this formula, forty-five municipalities originally subject to the decree have received exemptions. An affidavit in the record explains that no department’s appointing authority has objected to this formula since it has been in place. This understanding of the decree has been memorialized in a 1987 memorandum circulated by the Massachusetts Department of Personnel Administration outlining “the process and the criteria for seeking approval for exemption” from the Beecher decree. This memorandum, using the same terminology as the November 1975 Agreement, states that a municipality must consider the “full-time uniformed force” and calculate the percentage of *42 “post-probationary (tenured) full-time permanent Black or Hispanic members of the uniformed force” to determine whether parity has been achieved.
The majority dismisses the importance of this memorandum, concluding that “a federal appellate court owes no deference to [a state agency helping to administer compliance with a federal judicial decree] when endeavoring to discern the meaning and constitutional limits of such a decree.” As a generality this point is a fair one. But this memorandum from the Massachusetts Department of Personnel Administration demonstrates much more than a reasonable interpretation of ambiguous language in a federal decree by a helpful state agency. This memorandum describes a “pattern of past practice” of the application of language in the November 1975 Agreement by one of the parties to the original litigation.
The Commissioners of the Massachusetts Division of Civil Service were some of the named defendants in the consolidated Beecher litigation. At some point, the Department of Personnel Administration became the successor to the Division of Civil Services and responsible for carrying out the remedial provisions of the decree. Paragraph 1 of the April 1975 decree describes how the “Director of Civil Service [hereinafter Director shall mean the Director, his successors, or after July 1,1975, the Personnel Administrator]” should implement the original Beecher decree.[14] Paragraph 1 of the November 1975 Agreement refers to “The Division[15] of Personnel Administration (formerly known as the Division of Civil Service, and hereinafter, the ‘Division’) ....” Paragraph 11 of the November 1975 Agreement designates the “Division” as the agency to which municipal fire departments should apply for exemptions from the decree. The November 1975 Agreement was also signed by counsel for the “Director of Personnel Administration.” The memorandum in question, then, was not issued by an agency that was a stranger to the underlying litigation. Instead, it was crafted by a party to the Beecher litigation with the court-ordered responsibility to review the petitions of municipal fire departments for exemption from the decree. Under these circumstances, the insistence in Machín on the persuasive value of a pattern of past practice under the decree is particularly apt. See also Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1353 (1st Cir.1991) (Cyr, J., concurring in part and dissenting in part) (analogizing a consent decree to a contract: “Under a well-established rule of contract interpretation, the court may look to the parties’ post-contract course of conduct and performance to ascertain the ‘practical interpretation and application’ that the parties themselves attached to the ambiguous contract language.”) (emphasis in original).
The majority says that Machín’s directive to consider post-execution practice to interpret the decree’s meaning is “inap-posite” in this case because the evidence of the practice in question is being used “to change the meaning of plain language and thus to validate an unlikely interpretation” of the Beecher decree. However, there is no plain language in the decrees on the issue of the first variable, and the “unlikely interpretation” was one adopted by one of *43 the parties to the underlying litigation and complied with by many other municipalities subject to the decree. Therefore, the majority’s interpretation of the decree runs contrary both to Massachusetts’s demonstrated understanding of it and to the lengthy history of its application in granting many exemptions from the decree over a period of at least sixteen years (that is, since 1987).
It is also difficult to reconcile the majority’s interpretation of the decree with incentives that would have seemed sensible to the parties to the decree. If, at the time the decree was entered, a city fire department knew that it needed to show parity only in its entry-level class to receive an exemption from the decree, it could achieve its goals more quickly by keeping all the minority firefighters it hired at the entry level — that is, by selecting for promotion only non-minority firefighters. The majority’s interpretation would have provided an incentive for fire departments not to promote the black and Hispanic firefighters it hired under the terms of the decree. Every minority firefighter promoted to an officer position would have been another black or Hispanic member of the department that did not count towards the calculation of parity.
Although there is no evidence in the record that the Boston Fire Department (“BFD”) has ever discriminated against black and Hispanic firefighters in its previous promotion decisions, the majority’s interpretation of the decree creates an incentive for discriminatory behavior for those municipalities still subject to the decree after the resolution of this case. I cannot imagine that the plaintiffs in the Beecher litigation and the district court would have decided upon a remedy that provides incentives so at odds with the purpose of the litigation and the relief ordered.[16]
II. Narrow Tailoring
To support its interpretation of the Beecher decree, the majority contends that the interpretation advanced by the city and the NAACP “would mean that the Beecher decree was not narrowly tailored to serve its stated purpose.” In elaborating on this point, the majority raises another argument that was not raised by the Candidates:
Such an interpretation would effectively transform an instrument carefully crafted to eliminate discrimination in recruitment and hiring into general leverage favoring minorities in a much wider variety of matters. In most of those areas — promotion is a good example — no justification for systematic preferential treatment of minorities has been established.
As I understand it, the majority reasons that the interpretation of the Beecher decree advocated by the NAACP and the city would impermissibly benefit minority firefighters by somehow giving them preferences for promotions even though the Beecher court made no findings regarding the constitutionality of the promotion policies of the fire departments subject to the decree. This effect of the Beecher decree, the majority concludes, would render it unconstitutional.
*44 I disagree with this conclusion because the decree does not in fact have the effect of granting minorities preferential treatment in promotions. That is, I fail to see how merely calculating parity by taking the entire department into consideration leads to a “systematic preferential treatment of minorities” in the promotion process. First, there is no evidence in the record that minority firefighters hired in accordance with the Beecher decree have received preferences for promotions. Therefore, the majority’s conclusion about such an effect is entirely speculative. Second, the logic of the majority’s “preferential treatment” argument is problematic. By its terms, the Beecher decree does not explicitly address the promotion policies of the BFD or any other fire department in any way. Whether parity is calculated by taking into consideration merely entry-level firefighters, or by also including lieutenants, captains, and chiefs, the decree does not mandate changes in the department’s promotion practices. Because the criteria for promoting firefighters, whatever they may be, are independent from the hiring criteria, the Beecher court’s alterations to the BFD’s hiring criteria have no effect on its promotion criteria. Therefore, whether or not the Beecher decree continues to direct the method by which the department hires new firefighters, we can only assume, without any evidence to the contrary, that the department will continue to decide promotions in the same way it always has.
True, by design, the decree results in an increase in the diversity of the class from which the BFD selects the firefighters for promotion. However, this consequence of the decree cannot be “general leverage favoring minorities.” In any organization that promotes from within, the application of a hiring decree that results in the employment of minorities that otherwise would not have been hired necessarily increases the possibility that some of those minorities will be promoted to officers and thereby change the racial makeup of the officer ranks. Just because the decree has the consequence of changing the racial composition of the pool of those eligible for promotions does not mean that it is unconstitutional.
III. Changed Circumstances
As noted, the Candidates concede that, “[w]hen the Beecher decree was originally conceived, its apparent goal was to generate racial parity in the Fire Department as a whole, as opposed to merely the firefighter ranks.” However, they argue that after twenty-eight years, “a different analysis must be used if the decree is to be implemented in a constitutionally acceptable manner.” Specifically, the Candidates point to three changed circumstances that they claim require a revised interpretation of the decree. First, they say that it has become evident over time that the decree is ineffective for the purpose of generating racial diversity in the upper ranks of the BFD. Second, the Candidates remind us that twenty-eight years have elapsed since the entry of the Beecher decree, and argue that this is simply too long to wait for the realization of rough parity. Third, when the scope of the inquiry is restricted to consideration of only entry-level firefighters, statistics show that the percentage of minority firefighters exceeds the percentage of minorities in the community, resulting in an “excess of parity” at the entry level.
Frankly, I am at a loss to understand this third “changed circumstance” as a discrete argument. The Candidates offer two variations of “excess of parity.” In the first, the Candidates use a computation of parity that the majority has rightly rejected. That computation reflects the difference between the percentage of minority *45 firefighters (39.9%) and the minority population of Boston aged 18 and older (32.6%). I agree with the majority that stare decisis requires the use of the percentage of minorities in the general population, rather than the adult population, as the second variable for gauging parity. In the alternative, the Candidates assert that “even assuming that general population statistics are to be considered, the minority composition of the Department’s firefighters (39.9%) exceeded the minority composition of the general population of Boston (38.3%).” However, after conceding that “[w]hen the Beecher decree was originally conceived, its apparent goal was to generate racial parity in the Fire Department as a whole, as opposed to merely the firefighter ranks,” the Candidates do not use this formulation of “excess of parity” to articulate a distinct constitutional argument. Instead, they use the statistics as evidence that the decree is not effective for the purposes of achieving this “apparent goal” of racial diversity in the upper ranks of the BFD. Hence, because “excess of parity” in the firefighter rank is inescapably tied to the first “changed circumstance” argument relating to the ineffectiveness of the decree, I will not address this “excess of parity” argument independently. Instead, I will incorporate my discussion of excess parity in the ineffectiveness argument.
While modification of a consent decree is warranted if there is “a significant change either in factual conditions or in law,” Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), “a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.” Id. at 383, 112 S.Ct. 748. The Candidates have failed to carry this burden.
A. Ineffectiveness of the Decree.
The Candidates assert that although 39.9% of entry-level firefighters in the BFD are minorities, only 6.2% (22 of 350) of uniformed personnel above the rank of firefighter are minorities. They assert that “after 28 years, this is not a temporary status,” and that continuation of the decree will only increase disparity in favor of minorities at the entry level. Claimants argue that this changed circumstance implicates narrow tailoring because the Beecher decree has proven ineffective in achieving its goals. In other words, the unexpected barrier between the entry-level and the upper ranks, experienced by minorities within the BFD, demonstrates that the race-conscious hiring process is not narrowly tailored to serve the decree’s goals of parity within the BFD.
Interestingly, the majority’s narrow tailoring argument and the Candidates’s narrow tailoring argument are based on contradictory factual premises. The majority rejects the inclusion of higher ranks in the computation of parity because, in part, such inclusion unconstitutionally transforms the decree into an instrument of “general leverage favoring minorities” in promotions. By contrast, the Candidates assert that the decree is unconstitutional because it is ineffective in furthering the promotion of minorities to the upper ranks.
There are two ways to understand the Candidates’ ineffectiveness argument. The Candidates may be arguing that the Beecher decree, as originally conceived, requires parity at both the entry-level and among the upper ranks. Because of the alleged barrier to the promotion of minority firefighters, the Candidates contend that the decree is ineffective in achieving this goal. Alternatively, they may be arguing that the purpose of the decree is to *46 achieve parity in the department as a whole, irrespective of the distribution of minorities at all levels of the department. Given the barrier to promotions, they assert that the only way this parity can be achieved is indirectly — that is, by impermissible “overloading” of minorities at the entry-level to “offset” the lack of diversity in the upper ranks — and that this effect is fatal to narrow tailoring. I will address separately these variations of the ineffectiveness argument.
1. Parity at the Entry Level and in the Upper Ranks
The Candidates’s first ineffectiveness argument is premised on their characterization of the original purpose of the decree, described as an assumption. That is, they attribute to the district court in Beecher the assumption that “once the discriminatory effects of the entrance hurdles were removed, minorities would trickle through the fire department somewhat evenly.” There is a basic flaw in this premise. At the time the Beecher decree was entered, the percentage of minority firefighters in the BFD was less than one percent. It would have been pointless for the Beecher court to make any assumptions about promotion practices when the total number of minorities in the BFD was negligible. Moreover, the court did not enter its decree only to remedy discrimination in the Boston fire department. The Beecher court made fifty-five other municipalities in Massachusetts subject to the Beecher decree, and specifically noted the disproportionately low percentage of minorities in the “total force” of other towns.[17] Essentially, there were few minorities to promote in any of the cities or towns, and the Candidates never explain why the Beecher court would have made any assumptions about promotion practices. Therefore, it is unpersuasive to attribute to the Beecher court the assumption described in the Candidates’ brief that “once the discriminatory effects of the entrance hurdles were removed, minorities would trickle through the fire department somewhat evenly.” Instead, it is more reasonable to attribute to the Beecher court the goal reflected in the explicit language of the decree: “a complement of minorities commensurate with the percentage of minorities” within each municipality. Beecher, 371 F.Supp. at 523. The City, an original party to the decree, states the purpose of the decree well in its brief: “increasing the total gross proportion of minority fire personnel in each appointing authority.”
Indeed, as noted earlier, the Beecher court discusses the purpose of the decree in its original opinion ordering remedial action and establishing the framework for the subsequent consent decree. There it states that in 1974 “blacks and Spanish-surnamed persons represent such an insignificant percentage of the force,” and that these “present effects of past discrimination must be remedied.” Beecher I, 371 F.Supp. at 519-20. The decree says nothing about anticipating racial proportionality in both the entry-level and the upper ranks. The Candidates’ argument of ineffectiveness in achieving such proportionality fails because it is premised on a goal *47 that is nowhere discernible in the Beecher decree or decision.
2. Parity in the Department as a Whole
Even if the purpose of the Beecher decree is to diversify the entire department, without regard to the even distribution of minorities in the entry level and upper ranks, the Candidates argue that, given the barrier to minority promotion in the department, continuation of the decree will only increase disparity in favor of minorities at the entry level. From this changed circumstance, the Candidates offer a complicated narrow tailoring argument that does not lend itself to easy summary. Hence, I quote it at length:
If the method of promotion is appropriate, is not discriminatory, and nevertheless leads to racial disparity at the top levels, then it is inappropriate to try to “offset” legitimate promotions with an increased minority presence at the bottom. In other words, parity may currently exist in the upper levels of the Fire Department, in that it may reflect the appropriate proportion of minorities in the qualified labor pool for such promotions .... If so, this parity can not be used to justify further hiring quotas in the lower ranks.
In the alternative, if lack of minorities at the top levels is the result of a discriminatory promotional procedure (of which there is no proof), the requirement to “narrowly tailor” racial preferences requires that the specific promotional problem be addressed directly, and not indirectly through affirmative action at the lowest level. Indeed, more minorities in a lower position does not remedy the problem of a “discriminatory” promotional process.
To comply with strict scrutiny, a racial remedy must be effective. It is inappropriate to address alleged disparity in the upper ranks indirectly using racial preferences to fill 'the lower ranks, when minorities are not being promoted in proportionate numbers.
The Candidates’s narrow tailoring argument asserts that there are only two possible causes for the discrepancy between the percentage of minorities at the entry-level and the percentage of minorities in the upper ranks: (a) the low percentage of minorities in the upper ranks is an accurate reflection of the qualified applicant pool, or (b) the low percentage of minorities reflects discrimination in the promotion process. They say that if the barrier to promotion is due to the lack of qualified minority applicants, then the decree is not narrowly tailored because it requires the overloading of minorities at the entry-level to offset this dearth of minorities qualified for the upper ranks. Alternately, if the barrier to promotion is due to discrimination, the decree is ineffective in addressing this problem because it focuses only on hiring practices. Since there are only two possible causes of the discrepancy between the percentage of minorities at the entry-level and the percentage of minorities in the upper ranks, and each cause demonstrates that the decree is not narrowly tailored to serve the decree’s goals of parity within the entire Fire Department, the Candidates argue that this “conundrum,” as they describe it, conclusively proves that the decree fails the narrow tailoring test.
This logic reveals another flawed premise. Causes (a) and (b) do not represent the universe of possible explanations for the discrepancy. In fact, the City offers a third plausible and constitutionally sound explanation. Based on its experience with public employment affirmative action programs, the City posits that it may just take a long time for affirmative action *48 measures at the entry level of the BFD to influence minority representation in the higher ranks. Instead of being evidence of a barrier to promotion, the fact that only 6.2% of the higher ranks of the department is minority may evidence an inescapably slow process of growing diversity throughout the department. At the time the Beecher decree was implemented in 1974, minorities represented only 0.9% of the total BFD. Beecher I, 371 F.Supp. at 514. While far from representative of the minority population of the community, the 6.2% minority representation in the upper ranks is a significant increase indicating that the decree, however slowly, is fostering diversity in the upper ranks. Indeed, there has been a demonstrable increase in the number of minority officers recently. The City’s response to the Candidates’ interrogatories, included in the summary judgment record, indicates that there were 17 minority officers in 1998, 18 in 1999, and 22 in 2000. Over a span of two years, the percentage of minority officers increased from 4.8% to 6.2%.
Moreover, the slow rate of change in the officer ranks is not surprising in an organization the size of the BFD. While the department employs over 1500 firefighting personnel, only 350 of those hold officer positions — less than 25 percent. Although the record reveals that it is not uncommon for Boston to hire 50 new firefighters in a particular year, it is highly unlikely that a department with only 350 officer positions will promote that many over the same time period. Because the annual promotion rate will generally be much lower than the annual hiring rate, evidence that minorities are not penetrating the upper levels of the department as quickly as the entry level is predictable. In concluding that there is an intractable barrier to minority promotion in the department merely because there are only 22 minority officers, the Candidates take too grudging a view of progress.
With their conundrum argument, the Candidates have constructed an argument designed to succeed on the basis of logic instead of proof: because both of the possible explanations for the discrepancy between the percentages of minorities in the entry-levels and upper ranks indicate a lack of narrow tailoring, they assert that they do not have to prove the reality of either explanation. However, as noted, the logic is faulty because it fails to account for other plausible and constitutionally sound explanations for the discrepancy. Therefore, even on the assumption that there might be a narrow tailoring problem with the Beecher decree if either of the Candidates’ explanations of the discrepancy were real (unqualified applicants for promotion or discriminatory promotion practices), the Candidates must offer proof of one of these explanations. They have failed to do so.
As the Candidates themselves point out, there is no evidence of discriminatory promotion practices. The alternative “unqualified applicants” explanation[18] is objectionable on a number of grounds. First, the Beecher court found that the entrance examination for firefighters was not indicative of job performance and had a discriminatory impact on minorities. Beecher 371 F.Supp. at 517-18. Second, as we made clear in Mackin, 969 F.2d at 1278, the Beecher court specifically designed the decree to require the hiring of only qualified applicants. Third, the Candidates themselves assert that the entry-level and promotional positions have “markedly different skill, experience and knowledge requirements,” making performance on the entrance examination of little relevance to promotional success. *49 There is simply no proof in this record that the 6.2% statistic represents the “appropriate proportion of minorities in the qualified labor pool for such promotions.”
The Candidates bear the burden of proving the existence of changed circumstances undermining the constitutionality of a consent decree. Rufo, 502 U.S. at 383, 112 S.Ct. 748. Mere recitation of the current statistics describing the racial composition of the entry-level and upper ranks is insufficient. Thus, the Candidates have failed to carry their burden of proving substantial changed circumstances affecting the constitutional validity of the decree.
B. Duration of the Decree
Although we rejected this' argument when we decided Mackin, the Candidates argue that the passage of time (now twenty eight years) is itself a changed circumstance that demonstrates the ineffectiveness of the Beecher decree. That argument is as unpersuasive now as it was when we decided Mackin. Then we said:
[T]he decree’s life is limited, remaining in force only until its requirements have been met.... Indeed, the proof of the present pudding is that, since 1974, more than fifty percent of the communities originally affected by the decree have already been freed from further oversight.
Mackin, 969 F.2d at 1278 (citations omitted).
Today, the fifty percent figure cited in Mackin ten years ago has reached eighty percent, with forty-five out of fifty-six communities originally affected by the decree having now achieved parity and thus exclusion from further oversight. The Beecher decree remains limited in duration because it is extinguished upon the achievement of a demonstrably attainable rough parity. See Beecher, 371 F.Supp. at 523 (providing for release from appointment process mandated by the decree “as a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community”). Limitations of this sort are crucial factors in evaluating overbreadth challenges. See Stuart v. Roache, 951 F.2d 446, 454 (1st Cir.1991). Nothing about the race-conscious appointment process of the Beecher decree resembles “remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.” Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 276, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); see also City of Richmond v. J.A. Croson Co., 488 U.S. 469, 498, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). With so much compliance elsewhere, and with so much progress in Boston towards rough parity, the mere passage of time does not demonstrate the decree’s ineffectiveness.
IV. Conclusion
At least since our decision in Mackin ten years ago, the Beecher decree has had a settled meaning. Pursuant to that settled meaning, the fire departments of eighty percent of the municipalities subject to the Beecher decree have achieved compliance with it. Now, faced with a renewed challenge to the decree by Candidates who feel themselves unfairly barred from employment opportunities in the BFD, the majority finds new meaning in an old decree. I disagree with that conclusion. It cannot be reconciled with our precedent in Mackin, sound principles of interpretation applicable to a consent decree, or the history of this case. Taking a different tack, the Candidates challenge the Beecher decree by constructing changed circumstances arguments that are unpersuasive because of faulty logic, the absence of proof, and prior rejection in Mackin.
The Beecher decree is not just about the BFD. It was and remains a decree applicable to other cities and towns in Massachusetts. Although it is regrettable that the substantial progress of the BFD in ending its discriminatory hiring practices has not yet reached the goal of rough parity required by the decree, that remaining gap *50 is no justification for altering a decree which requires, with a formula now long accepted, that the “present effects of past discrimination must be remedied.” Beecher, 371 F.Supp. at 520. Until that gap is closed, the remedial purpose of the decree remains unfulfilled. We should stay the course, not abandon it. I respectfully dissent.
Before BOUDIN, Chief Judge, STAHL, Senior Circuit Judge, TORRUELLA, SELYA, LYNCH*, LIPEZ, and HOWARD, Circuit Judges.
The panel of judges that rendered the decision in this case having voted to deny the petitions for rehearing with one judge dissenting and the suggestions for rehearing en banc having been carefully considered by the judges of the Court in regular active service and a majority of said judges not having voted to order that the appeal be reheard by the Court en banc,
It is ordered that the petitions for rehearing and the suggestions for rehearing enc banc be denied.
Chief Judge Boundin, Judge Torruella and Judge Lipez would grant the petitions for rehearing en banc. A separate statement by Judge Lipez, joined by Judge Torruella, is attached to this order.

. In our first review of the decree, we paraphrased the parity paragraph of the decree, saying that "[t]he decree remains in force, for each local fire department, until that department attains sufficient minority fire fighters to have a percentage on the force approximately equal to the percentage of minorities in the locality.” Boston Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017, 1026-27 (1st Cir.1974). While the use of the term "fire fighters” may have been a shorthand description of the decree, it certainly should not supplant the language of the original decree.

. The majority dismisses the city's reliance on the terminology of the November 1975 Agreement because that Agreement "incorporates by reference paragraph 7” of the April 1975 decree, which uses the term "firefighters,” and therefore "leads us back to our starting point.” The majority assumes that the April 1975 decree should be the court’s "starting point.” The starting point of the *41 analysis should be the original Beecher decree — which uses the phrase "complement of minorities.” Beecher, 371 F.Supp. at 523.

. In support of its argument that “firefighter” is the operative term for interpreting the decree, the majority notes that the term "firefighter” is used "no fewer than twenty-six times in the decrees, while the term 'uniformed personnel' appears only once.” While likely true, this statement is beside the point. For example, the term "firefighter” is used no fewer than ten times simply to describe the examination given to candidates, for example "valid firefighter entrance examination” and "fire fighter examination.” As I indicated, one must focus on the operative term of the decrees, i.e. the language which explains the meaning of parity. In that context, the word "firefighter” is one of only three formulations.

. The bracketed words are in the April 1975 decree.

. Although the Beecher court referred to the Division of Personnel Administration, the agency calls itself the Department of Personnel Administration. I assume that the agencies in question are one and the same. There does not currently exist a Massachusetts agency with the official name Division of Personnel Administration.

. In a footnote to its opinion, the majority cites this point as evidence that I do not understand the difference between strict scrutiny and rational basis review. Self-evidently, I make this point only in support of the original meaning of the decree advanced by the defendants and acknowledged by the Candidates. I do not proffer it as a constitutional basis for upholding the decree. My conclusion that this original interpretation of the decree is constitutional, or more specifically, that it is narrowly tailored to a compelling government interest, is presented in the section that follows.

. "The City of Springfield has a black population of approximately 13%. Of 475 firefighters in that city, one is black and none are Spanish-surnamed. The one black represents 0.2% of the total force. The City of Cambridge has a black population of 6.1%, and a fire fighting force of 305 men, four of whom are black; one is Spanish-surnamed. They represent approximately 2% of the total force. New Bedford has a black population of approximately 3.5%. Minorities represent approximately 1% of the fire force. Worcester has a black population of approximately 2%. Minorities represent 1% of the fire force there." Beecher, 371 F.Supp. at 514 (emphasis added).

. The Candidates elaborate on this explanation as follows: ”[B]ecause affirmative action benefits minorities that score lower on the entrance examinations ... [w]hen these lower scorers seek promotions, they are competing against non-minorities who have scored at the very top of the entrance examination.”