Julia A. McLAUGHLIN, by Catherine McLAUGHLIN, Plaintiff,

v.

BOSTON SCHOOL COMMITTEE, et al., Defendants.

Civil Action No. 95–11803–WAG.

United States District Court, D. Massachusetts.

Dec. 10, 1996.[1]

Mark A. White, O'Brien, Partlow & White, P.C., Boston, MA, Michael C. McLaughlin, Law Offices of Michael C. McLaughlin, Boston, MA, R. Keith Partlow, O'Brien, Partlow & White, P.C., Boston, MA, for Julia A. McLaughlin.

William F. Looney, Jr., Looney & Grossman, Boston, MA, Henry C. Dinger, John H. Branson, Eric R. Barber–Mingo, Goodwin, Procter & Hoar, Boston, MA, for Boston School Committee.

1. Due to circumstances beyond the court reporter's control, the official transcript of the hearing on November 19, 1996, at the end of which the court dictated its dispositive memorandum and order of dismissal, was not filed until December 2, 1996.

Henry C. Dinger, John H. Branson, Goodwin, Proctor & Hoar, Boston, MA, for Felix D. Arroyo, Robert P. Gittens, John Gould, Alfreda J. Harris, Dr. Edwin Melendez, Dr. Elizabeth Relinger, William Spring, Ofelia Pedraza, Thomas Payzant, Dr. Lois Harrison–Jones, Catherine A. Ellison, Arthur Stellar.

## SUPPLEMENTARY MEMORANDUM

GARRITY, District Judge.

Plaintiff's complaint claimed that she was denied admission to the seventh grade at Boston Latin School ("BLS") because of a racial set aside originally ordered as part of a Court desegregation plan which, after the Court's jurisdiction over student assignments ended, was adopted in February 1989 by the Boston School Committee ("BSC") as part of a controlled choice desegregation plan ("CCP"). Plaintiff, who is white, sought admission to BLS, contending that the set aside guaranteeing 35% of seventh grade admissions to Blacks and Hispanics violated her rights under the Equal Protection Clause of the Fourteenth Amendment. The complaint contained only boiler plate requests for damages, i.e., without particulars except for attorneys fees and costs. BSC's defense was that the set aside was constitutional, since narrowly tailored to advance compelling municipal interests: eliminating lingering effects of prior intentional segregation by predecessor BSCs and promoting racial/ethnic diversity in an urban school system more than 70% Black and Hispanic. The issue presented was whether the set aside would withstand strict scrutiny[2] under Supreme Court criteria exemplified by Justice O'Connor's opinion in *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995).

### Background

A motion by plaintiff for a preliminary injunction ordering her admission to the seventh grade at BLS was denied on August 28, 1995; but plaintiff's renewed motion for the same relief was granted on August 22, 1996 ordering her admission to the eighth grade the following week. *See McLaughlin v. Boston Sch. Comm.,* 938 F.Supp. 1001 (D.Mass. 1996). Thereafter the focus of the parties submissions to the court changed. Having been admitted to BLS, plaintiff now stressed her claim for declaratory relief to the effect that racial classifications of any sort in making student assignments to any of the city's public schools are violative of the Equal Protection Clause.[3] While not abandoning explicitly their position that the 35% set aside would withstand strict scrutiny, defendants now emphasized "alternatives to the current examination school assignment process." They filed successive motions to postpone the trial until after the BSC had received and acted upon the advisory group's recommendations. At a hearing on October 1, 1996, the Court sustained plaintiff's objection to defendants' motion to postpone the trial until 1997, scheduled the final pretrial conference for November 13, and set trial to start on November 19. At the final pretrial conference, the Court heard another similar defendants' motion, for reconsideration of the date for trial, and again sustained plaintiff's objection. It became apparent that both parties were less concerned with the constitutionality of the particular set aside at issue in the instant litigation than with BSC's future assignment policies.

The Court's pre-trial memorandum dated November 13 reaffirmed the authority and responsibility of the BSC and the relatively narrow scope of the issues framed by the parties in their pleadings and at several pretrial conferences, stating *inter alia:*

> The Court's jurisdiction is strictly limited to ruling on the constitutionality of a Latin School assignment formula adopted by the School Committee on February 27, 1989. Plans for future student assignments, unless involving a constitutional violation, are

---

**2.** The applicability of the strict scrutiny test to racial classification of public school pupils generally was not contested by the defendants.

**3.** For example, on November 19 plaintiff's concluding argument was that the Court should

"make a determination that will have some significance and some precedential value. And that's what we came before this Court for and that's what we seek."

beyond its jurisdiction. It is the school authorities who "are traditionally charged with the broad power to formulate and implement educational policy." *Swann v. Charlotte–Mecklenburg Bd. of Ed.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

On November 14, BSC met in executive session and voted (*see* Appendix I) to continue plaintiff's enrollment at BLS so long as she satisfies its academic requirements. On November 15, BSC filed a suggestion "that the issues scheduled to be tried by this Court next week are moot." Hearing was set for November 19; supporting and opposing memoranda were filed by the parties. At the conclusion of the hearing, the Court adopted defendants' suggestion, ruled that it no longer had subject matter jurisdiction and dismissed the case pursuant to Rule 12(h)(3).

*Mootness*

■ The jurisdiction of a federal court, unlike that of a state court, is limited by Article III of the Constitution of the United States to deciding actual "cases" or "controversies" between parties having adverse legal interests. *Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 374–75, 78 L.Ed.2d 58 (1983). Absent such a case or controversy, "there is no subject matter jurisdiction on which the judgment of the court's order can operate," *Ex parte Baez,* 177 U.S. 378, 390, 20 S.Ct. 673, 677, 44 L.Ed. 813 (1900), and the case must, therefore, be dismissed. Fed.R.Civ.P. 12(h)(3). Generally a controversy disappears when a party no longer has a personal stake in the outcome of the litigation. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). Thus when the defendant voted to continue plaintiff's enrollment at BLS so long as she satisfies the academic requirements, thereby depriving

her of a personal stake in the outcome of this litigation,[4] this case became apparently moot.

On the other hand, a controversy will be deemed to continue even absent a party's personal stake in the outcome of the case when there is a reasonable expectation that the same complaining party would be subject to the same action again. *See Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183–84, 71 L.Ed.2d 353 (1982). No such expectation exists in the instant case. Given plaintiff's permanent enrollment at BLS, she cannot possibly be subject again to exclusion from BLS on account of the 35% set aside. Mootness here flows from "the simple fact that" plaintiff is now permanently enrolled at BLS where she will be permitted to complete her course of study. *See DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 1706–07, 40 L.Ed.2d 164 (1974). Under remarkably similar circumstances the *DeFunis* decision explained, "Because [plaintiff] will complete [her] ... studies ... regardless of any decision this Court might reach on the merits of this litigation, we conclude that the Court cannot, consistently with the limitations of Article III of the Constitution, consider the substantive constitutional issues tendered by the parties." *Id.* at 319–20, 94 S.Ct. at 1707.

It is critical that plaintiff chose not to cast her suit as a class action.[5] "[T]his factor significantly affects the mootness determination." *Sosna v. Iowa,* 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975). By deliberately suing only on her own behalf, plaintiff buttressed her claim for injunctive relief but laid the groundwork for defendants' mooting maneuver which deprived the Court of subject matter jurisdiction and requires that the case be dismissed. *See* Fed. R.Civ.P. 12(h)(3); *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975).

**4.** Plaintiff's interest in recovering attorneys fees and costs is insufficient to prevent mootness. *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 480, 110 S.Ct. 1249, 1255, 108 L.Ed.2d 400 (1990).

**5.** Of course, the differences between individual and class actions are much more than nomenclature. Class actions must comply with the com-

plicated requirements of Rule 23, Fed.R.Civ.P. *See* 7A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 1753, at 45 (West 1986). Provisions for class certification and notification involve questions of due process of law which are inapplicable to individual actions.

*Supplementary Dicta*

■ In view of the public interest in the case and the vacillating positions of the parties, it should be noted that the order of dismissal did not decide the constitutionality of any BSC policies, not even that of the set aside challenged by the plaintiff. In several submissions, plaintiff suggested that this litigation could be settled by a stipulation of the parties to the effect that the 35% set aside was unconstitutional. Such a stipulation would have no legal effect. Deciding constitutional questions is the special province and responsibility of the courts, the third branch of government, and not the business of school committee members, however earnest they may be and expert in matters of school administration.

Consistent with these principles, the BSC's two votes on November 14 (*see* Appendix I) were carefully worded. The stated purpose of the first, to keep plaintiff at BLS, was "to avoid any further disruption in her education." The second vote, to "no longer employ the 35% set-aside," was explained in a memorandum by Dr. Elizabeth Reilinger, BSC member and co-chair of the advisory group. Regarding rejection of the option to retain the current policy, it asserted that "this option has the potential for involving the BPS [Boston Public Schools] in litigation which would drain resources from improving teaching and learning systemwide."

*Counsel Fees*

Plaintiff's complaint having been filed under 42 U.S.C. § 1983, an award of counsel fees is governed by § 1988 which provides that "the Court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." The subject was discussed briefly at oral argument. The applicable law is well settled, having evolved since the seminal decision in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), which defined a "prevailing party." The question presented is whether plaintiff is entitled to recover attorney's fees despite dismissal of her case on the ground of mootness. The leading case in this Circuit, *Pearson v. Fair*, 980 F.2d 37 (1st Cir.1992), ruled that "a litigant may be con-

sidered a prevailing party for attorneys' fees purposes ... even absent success on the merits, '[if the litigant's suit] had a catalytic effect in bringing about a desired result,'" *id.* at 43 (citing *Langton v. Johnston*, 928 F.2d 1206, 1224 (1st Cir.1991)), and that "[t]he catalyst test 'applies to plaintiffs who have succeeded in achieving favorable results because of the filing of their § 1983 claim, but have not had a final judgment on the merits entered in their favor.'" *Id.* at 44 (quoting *Langton*, 928 F.2d at 1224–25).

A report in the *Boston Herald* on November 23, 1996 quoted plaintiff's counsel as stating that "his bill, which includes the cost of experts and other expenses, will be roughly $225,000. He said he will charge his normal billing rate of $275 an hour." As yet no application for an award of attorney's fees and expenses has been filed with the Clerk. The following time table is now ordered: any application by plaintiff pursuant to 42 U.S.C. § 1988 shall be filed on or before December 13; to which defendant shall respond on or before December 18; to which plaintiff may reply on or before December 20. A hearing on any application by plaintiff is hereby scheduled for December 23, 1996 at 11:00 a.m.

APPENDIX I

THE SCHOOL COMMITTEE OF
THE CITY OF BOSTON

November 14, 1996
*School Committee Meeting*

*Executive Session*

BY CONSENSUS, the School Committee hereby directs its counsel in *Julia A. McLaughlin, et al. v. Boston School Committee, et al.*, formally to advise the Court and the parties that:

1. The School Committee waives any right to reassign Julia McLaughlin from Boston Latin School (so long as she satisfies the academic requirements of the school) to avoid any further disruption in her education.

2. In light of the advisory group's decision to recommend a range of alternative assignment processes that are consistent

with the School Committee's commitments to the maintenance of both diversity and academic excellence at the examination schools and the replacement of the 35% set-aside with such an alternative, the School Committee will no longer employ the 35% set-aside in connection with the assignment of students to the examination schools.

Attest:

/s/ Thomas W. Stanton
　　Thomas W. Stanton
　　Executive Secretary

## BOSTON PUBLIC SCHOOLS

### *MEMORANDUM*

TO:  Henry Dinger, Esq.

FROM:  Dr. Elizabeth Reilinger, Co–Chair

Exam School Assignment Task Force

SUBJECT:  Response to Court Order

DATE:  November 18, 1996

The following is a specification of the "alternatives for assigning students to the examination schools" as to which "the advisory group appointed by the School Committee reached consensus," and a specification of the "range of alternative assignment processes" which the advisory group decided to recommend.

To meet the goal of maintaining and reinforcing academic excellence, the advisory group will propose that for the exam schools, fifty percent (50%) of the seats be awarded to the highest ranking students (based on the current "Z" score), with ethnic guidelines calculated based on the remaining qualified applicant pool (those who score above the 50th percentile), and seats awarded accordingly to the highest ranking students. The net result, based on a weighted average of these two schools, would increase the percentage of seats filled by the highest ranking students by twelve percent (12%) from the current 84% to 96% of the seats. This reinforces the Task Force's goal of maintaining and reinforcing academic excellence in the exam schools.

A number of other options for the exam school assignment process were reviewed by the Task Force and deemed inadequate to meet the goal of maintaining academic excellence while insuring equal access for all students. A summary of each of these options is presented.

1. Straight from the top admissions, based on the current "Z" score (ISEE test and GPA): There is public support across the City for the straight from the top option, sometimes referred to as the "merit" option. However, there is concern that this option would result in a resegregation of the exam schools by reducing access for minority and bilingual students. The Task Force is hopeful that if the School Committee takes action on a number of recommendations presented in this report, the quality of education in the BPS can improve dramatically. With that in mind, consideration should be given by the School Committee to establishing a timeframe for transitioning from the proposed assignment option to a straight from the top approach.

2. Maintain current policy and/or increase set asides for minority students: While there is support for remedying past discrimination as well as for the value of diversity in enriching academic experiences, it is agreed that given recent legal decisions nationally, this option has the potential for involving the BPS in litigation which would drain resources from improving teaching and learning systemwide. In addition, there is agreement that this option does not address the basic need to adequately prepare all students to seek out, apply to and, succeed in, an academically challenging environment.

3. Policy based on income, geography, prior attendance at BPS: There is consensus that these options are extremely difficult to administer equitably, have the potential of creating additional bureaucratic obstacles and cost, and do not promote equal access or academic achievement.

4. Lottery: There is no support for this option as it does not reward academic achievement or increase access for any group of students and would likely result

in lowering the academic standards at the exam schools.