Sarah P. WESSMANN, a minor child
by her parent, Henry Robert
WESSMANN, Plaintiff,

v.

BOSTON SCHOOL COMMITTEE, Felix
D. Arroyo, Robert P. Gittens, Alfreda J.
Harris, Edwin Melendez, Susan Nai-
mark, Elizabeth Reilinger, William
Spring, Thomas Payzant, and Catherine
A. Ellison, Defendants.

No. CIV. 97–11923–JLT.

United States District Court,
D. Massachusetts.

May 28, 1998.

Michael C. McLaughlin, Boston, MA, for Plaintiff.

Frances S. Cohen, Janet A. Viggiani, Andres W. Lopez, Hill & Barlow, Boston, MA, Merita A. Hopkins, City of Boston Law Dept., Boston, MA, Diane Dilanni, Boston School Dept., Legal Advisor, Boston, MA, for Defendants.

## MEMORANDUM

TAURO, Chief Judge.

Plaintiff brings this lawsuit challenging the constitutionality of the policy, adopted by the Boston School Committee, that governs admission to Boston's three examination schools (the "Policy"): the Boston Latin School ("Boston Latin"), the Boston Latin Academy ("Latin Academy"), and the John D. O'Bryant School of Mathematics and Science ("O'Bryant"). The Policy admits half of each class solely on the basis of "composite score" ranking. The second half of the class is also admitted on the basis of composite score ranking, but in conjunction with "flexible racial/ethnic guidelines."

The plaintiff, Sarah Wessmann, alleges that, but for the application of the Policy, she would have been admitted to the ninth grade at Boston Latin. She asserts that she was denied admission due to her race and that defendants' policies and procedures violate the Fifth and Fourteenth Amendments to the United States Constitution.

After a hearing, this Court denied the plaintiff's request for a preliminary injunction that would have required her admission to Boston Latin, pending the resolution of this case on the merits. Following extensive discovery, a thirteen-day trial was commenced on January 28, 1998. The case was taken under advisement following the submission of post-trial briefs.

## I.

### THE PARTIES

The plaintiff, Sarah P. Wessmann, is a white ninth-grade student now attending Latin Academy. Her father, Henry Robert Wessmann, brings this suit on her behalf.

Sarah attended the Advent School, a small private school on Brimmer Street in Beacon Hill, through the sixth grade. While there, Sarah took a test preparation course for the Independent School Entrance Examination (the "ISEE") and applied to Boston Latin and Latin Academy. She was denied admission to Boston Latin's seventh-grade class, but she did enroll at Latin Academy, her second choice.

In the fall of 1996, Sarah applied for admission to Boston Latin's ninth-grade class for the 1997–98 school year. She was not admitted and continues to attend Latin Academy. It was this later denial of admission that prompted this law suit.

The defendants Felix D. Arroyo, Robert O. Gittens, Alfreda J. Harris, Edwin Melendez, Susan Naimark, Elizabeth Reilinger, and William Spring are members of the Boston School Committee. On December 18, 1996, Defendant Arroyo, Gittens, Harris, Melendez, Reilinger, and Spring each voted for the adoption of the Policy. The defendant Susan Naimark was not a member of the Boston School Committee when the Policy was adopted. The defendant Thomas W. Payzant has been the Superintendent of the Boston Public Schools since October of 1995. The defendant Catherine A. Ellison is the Senior Officer of the Department of Implementation.

## II.

## *PRIOR LITIGATION*

This case is the latest chapter in a longer history of prior litigation.[1] The seminal *Morgan* case was decided in 1974. *Morgan I*, 379 F.Supp. at 410. In that case, Judge Garrity concluded that the Boston School Committee had segregated the Boston Public Schools, including the examination schools, "with the purpose or intent to" do so. *Id.* at 480. Judge Garrity then assumed oversight of the Boston Public Schools. Among the issues that Judge Garrity addressed in *Morgan I* was black enrollment in the examination schools, which was:

| | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 |
|---|---|---|---|---|---|---|
| Boston Latin | 3.2% | 3.0% | 2.6% | 2.3% | 1.9% | 2.2% |
| Girls Latin (now Latin Academy) | 3.5% | 6.1% | 6.3% | 5.3% | 5.4% | 5.0% |
| Boston Tech. (now O'Bryant) | 6.7% | 8.5% | 8.1% | 8.3% | 10.8% | 13.7% |

*Id.* at 466.

In examining the then-existing admissions policies for the examination schools, Judge Garrity noted that students from schools with high percentages of whites performed "two to three times greater [on the admissions examination] than students from schools with high percentages of blacks." *Id.* at 467. The First Circuit later observed that the Boston School Committee was aware "that whites were much more successful than blacks on the entrance examinations, yet they made no effort to reconsider the appropriateness of the examinations." *Morgan v. Kerrigan*, 509 F.2d 580, 594 (1st Cir.1974).

With these observations in mind, Judge Garrity held that the Boston School Committee had an " 'affirmative obligation' to reverse the consequences of their unconstitutional conduct" and to "eliminate all vestiges of the dual system." *Morgan I*, 379 F.Supp. at 482. In determining what remedy would be effective, Judge Garrity observed that "ideally every school in the system would have the same racial proportions [as the city as a whole]." *Id.* at 483. The First Circuit affirmed Judge Garrity's conclusions, noting that "[t]he broad scope of the court's remedial program was necessary to transform" Boston's segregated system "into 'a unitary system in which racial discrimination would be eliminated root and branch.' " *Morgan III*, 831 F.2d at 316.

Judge Garrity fashioned a desegregation plan for the examination schools, providing that "[a]t least 35% of each of the entering classes at Boston Latin School, Boston Latin Academy and Boston Technical High in September 1975 shall be composed of black and Hispanic students." *Morgan II*, 401 F.Supp. at 258. In establishing this 35% set-aside, Judge Garrity noted that, in conjunction with Asian enrollment of between 6% and 8%, "the anticipated enrollment in the entering class at the examination schools will be similar regarding racial and ethnic composition to that at other citywide high schools." *Id.* at 244. In affirming Judge Garrity's remedial order, the First Circuit observed that the set-aside was a "basic tool in remedying constitutional violations." *Morgan v. Kerrigan*, 530 F.2d at 424 n. 35 (citations omitted).

In 1987, after more than sixteen years of his oversight, the First Circuit directed Judge Garrity to return control over the student assignment process to the Boston School Committee "in recognition that the 'local autonomy of school districts is a vital national tradition.' " *Morgan III*, 831 F.2d at 318 (quoting *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 410, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977)). But, the First Circuit also made clear that " 'unitariness' (i.e., complete desegregation) in *all* aspects of

1. *Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.1974) (*"Morgan I,"* finding that the school authorities knowingly carried out a systematic program of unconstitutional segregation in the Boston Public Schools and ordering remedial action), *aff'd sub nom.*, 509 F.2d 580 (1st Cir.1974); *Morgan v. Kerrigan*, 401 F.Supp. 216 (D.Mass.1975) (*"Morgan II,"* establishing a timetable for a specific desegregation plan, which included the use of minority set-asides), *aff'd*, 530 F.2d 401 (1st Cir.1976); *Morgan v. Nucci*, 831 F.2d 313 (1st Cir.1987) (*"Morgan III,"* ultimately returning control of the Boston Public Schools to the Boston School Committee); and *McLaughlin v. Boston School Committee*, 938 F.Supp. 1001 (D.Mass.1996) (ordering Boston Latin to admit the plaintiff, Julia McLaughlin, pending court resolution of her constitutional challenge to the then-existing admissions policy, which reserved 35% of the available sets for black and Hispanic students).

the Boston schools has not yet been achieved. For example, we point out [that] ... the school system has yet to attain targeted goals in minority faculty hiring." *Id.* In returning control over student assignment to the Boston School Committee, the First Circuit stated, "We have no reason to question the good faith of the present Boston School officials ... or to doubt that the return to local autonomy will do anything but preserve the gains the schools have made over the past 15 years." *Id.* at 326 n. 19.

On July 19, 1994, Judge Garrity issued a "Final Judgment As Amended" in the *Morgan* litigation, which enjoined the defendants in four areas. Final Judgement as Amended, *Morgan II*, 401 F.Supp. 216 (D.Mass.1975) (unpublished order) (hereinafter "Order"). First, it required them "to complete implementation of [the] Unified Facilities Plan." Order, at p. 2. Second, it required the defendants to maintain the Department of Implementation substantially in the way that it had been established by the court. Order, at p. 2–3. Third, it required the defendants to achieve and maintain a desegregated faculty and administrative staff. Order, at p. 3–5. Fourth, Judge Garrity "permanently enjoined" the defendants "from discriminating on the basis of race in the operation of the public schools of the City of Boston and from creating, promoting or maintaining racial segregation in any school or other facility in the Boston public school system." Order, at p. 5.

The next significant chapter in the Boston school saga came in August of 1995 when Julia McLaughlin, then a seventh-grade white student, filed suit against the Boston School Committee, alleging that, as a result of the 35% set-aside for black and Hispanic students, she had been unconstitutionally denied admission to Boston Latin. *McLaughlin*, 938 F.Supp. at 1001. Judge Garrity initially denied a motion for a preliminary injunction, which sought to admit Julia to Boston Latin for the 1995–96 school year, *id.*

at 1003, but, on August 22, 1996, he granted the injunction, admitting Julia for the 1996–97 year.[2] *Id.* at 1018.

On December 10, 1996, in light of the Boston School Committee's decisions to permit Julia to remain at Boston Latin and to adopt a new admissions policy that would eliminate the 35% set-aside, Judge Garrity dismissed the *McLaughlin* case as moot. *McLaughlin v. Boston School Committee*, 952 F.Supp. 33, 35 (D.Mass.1996).

## III.

### DEVELOPMENT OF THE POLICY

Mindful of Judge Garrity's injunction, the Boston School Committee made the task of developing a new admissions policy for Boston's examination schools a front-burner issue. For several months, extensive analysis and deliberation were undertaken, including: (1) an internal study directed by Superintendent Payzant; (2) the appointment of a Task Force and the issuance of its report following meetings and public hearings; (3) review and discussion by Boston School Committee members at public meetings; and (4) the recommendation of the Superintendent.

### A. *The Internal Study*

Sparked by the request of Superintendent Payzant, the Boston School Department reviewed admissions policy alternatives. They were assisted by Bain & Company, Inc. ("Bain"), a management consulting firm that had done prior work for the Boston School Department on a *pro bono* basis. After analyzing the statistics for the seventh-grade population of the 1995–96 school year, Bain presented its analysis of various options for admission. These included alternatives for admission based on: (1) composite score ranking; (2) socioeconomic status; (3) neighborhood of residence; (4) prior Boston Public School attendance; and (5) lottery, used either alone or in combination with the other

2. Judge Garrity noted that, although the 35% set-aside was unlikely to pass constitutional muster, a more narrowly tailored plan might do so. As an example, Judge Garrity suggested an admissions policy whereby the racial mix at each school would be determined by matching "the

percentages [of each race or ethnicity] to the relevant qualified applicant populations and [by] revisiting the policy periodically so as to ensure that demographic shifts ... do not render it obsolete." *McLaughlin*, 938 F.Supp. at 1016.

criteria. Superintendent Payzant presented these options to the Boston School Committee at a September 19, 1996 meeting.

## B. *The Task Force*

At that September 19, 1996 meeting, Boston School Committee Chairman Robert Gittens appointed a Task Force to analyze examination school admissions policy options.[3] The Boston School Committee's charge to the Task Force was to come up with an admissions policy for the examination schools that would ensure diversity, equal access, and excellence in teaching and learning.

The Task Force held eight public meetings, as well as five neighborhood hearings. It also met with the headmasters of the three examination schools, the Superintendent, employees from the Department of Implementation, lawyers from Goodwin, Procter & Hoar, and consultants from Bain.

Bain presented to the Task Force each of the thirteen options ("Options A through M") that it had prepared for the Boston School Department. Bain also offered an analysis of the economic and racial/ethnic mix of potential admittees under each option. The Task Force asked Bain to present three additional options, including one labeled "Option N," which would combine strict composite score ranking with flexible racial/ethnic guidelines.

After several re-drafts, the final report, which recommended adopting Option N, was provided to all members of the Task Force for approval. Two members, Lawrence DiCara and Susan Hughes, submitted dissenting views that were included in the report as Appendices. The report also included a statement by a third member, Nora Toney, expressing her intent to dissent before the Boston School Committee.

The Task Force's goal was to develop admissions options for the three examination schools that recognized academic excellence, access, fairness, and a respect for diversity as being essential elements to a quality public education experience. Its report stated that:

> [T]here is agreement among Task Force members that a multifaceted approach to improving teaching, learning and access for a diverse student body throughout the system is required in order to avoid returning the BPS and the exam schools to the segregated system of the past. In essence, the Task Force acknowledges that remedying past discrimination is important and, thus, must be given consideration in developing guidelines for admission to the exam schools.

To that end, the Task Force report went on to state:

> It has been determined that the option most responsive to the goals of maintaining academic excellence at the exam schools, while insuring equal access for all students, is one which combines a percentage of admissions based on performance rankings straight from the top, regardless of race, with the balance of admissions along flexible racial/ethnic guidelines, proportionate to the percentages in the qualified applicant pool.

And, the Task Force report recommended that the Boston School Committee adopt a sunset clause regardless of which option was ultimately selected, stating:

> The Task Force urges the School Committee to adopt a "sunset" clause, defining a timeline to review the exam school assignment policy to insure that it remains relevant, appropriate, and consumer-responsive. The Task Force recommends that a three to five-year timeframe be considered for this review.

---

3. The Task Force included: Boston School Committee members Elizabeth Reilinger and Felix Arroyo; as well as Charles Ogletree, Professor of Law at Harvard Law School; Nora Toney, President of the Black Educators Alliance of Massachusetts; Susan Hughes, a graduate of Boston Latin; Richard Chin, Executive Director of the South Cove YWCA; Lawrence DiCara, a partner at the law firm of Peabody & Brown; Antonio Molina, host of the radio show *"Buenos Dias, Boston"*; and Joan Reede, Assistant Dean of Harvard Medical School's Faculty Development and Diversity Program and Director of the Minority Faculty Development Program. Dr. Reilinger and Professor Ogletree served as the Task Force co-chairs.

### C. *Boston School Committee Consideration*

On November 20, 1996, Professor Ogletree and Ms. Reilinger presented the Task Force report to the Boston School Committee. Dissenting members of the Task Force were also heard. On December 4, 1996, the Curriculum and Operations Subcommittee of the Boston School Committee considered the Task Force report at a public meeting. In preparation for the subcommittee meeting, the Superintendent provided detailed answers to a series of questions regarding various admissions policy options and other support initiatives that had been considered.[4]

In addition to the data provided by the Superintendent, Boston School Committee members received and discussed the conclusions contained in an expert report that Dr. Susan Ellerin had prepared for the *McLaughlin* litigation. One of the conclusions reported by Dr. Ellerin was that:

> [T]here is little difference between the invitation rates for white applicants from Boston Public Schools and those from private or parochial schools, but this is not the case when minorities from public and private schools are compared. Instead, minorities who attended the Boston Public Schools are *significantly less likely* to be invited to attend Boston Latin School than minorities who have attended independent or METCO schools.

The Boston School Committee conducted public hearings on the examination schools' admissions policy on December 11 and 18, 1996. On December 18, 1996, it voted unanimously to adopt a new admissions policy for the three examination schools. It is that policy which underlies this litigation.

### IV.

### THE POLICY

The asserted philosophy of the Policy is that it "be based on standards of academic excellence, access, fairness and a respect for diversity and differences." The Policy also recognizes that:

> The most important priority for the Boston Public Schools must be to improve teaching and learning at all grade levels and in all schools in the system. This can be accomplished by: (1) fully implementing an academically rigorous curriculum; (2) promoting and graduating students based on standardized performance measures; and (3) linking student, teacher and school performance with outcomes.

Under the Policy, a student may chose to apply to one or more of the three examination schools and is included in the Applicant Pool for each school designated as a choice. A ranking is then assigned to each student in each school's Applicant Pool on the basis of his or her composite score. This composite score is calculated by combining the student's grade point average with his or her ISEE score.[5]

The Policy requires that, to be eligible for admission to an examination school, a student applicant must rank in the top half of the overall Applicant Pool. Those students who do rank in the top half of the Applicant Pool are designated as the "Qualified Applicant Pool." This eligibility requirement stems from the defendants' experience over the years that students who rank in the top 50th percentile of the overall Applicant Pool are qualified to succeed at any one of the three examination schools.

Of the available seats at each school, 50% are awarded on a straight-from-the-top basis

---

**4.** These included advanced work classes, which gave high-performing students who are able to benefit from greater depth in their curriculum more enrichment. Advanced work classes were originally designed not only to meet the academic needs of these advanced students, but also to help these students prepare for the challenges of the examination schools. Currently, advanced work classes are offered in grades four, five, and six at ten middle schools and thirteen elementary schools within the Boston Public School system. Other support initiatives considered included ad-

ditional student tutoring, academic summer programs, and individualized ISEE test preparation.

**5.** This general procedure was adopted in 1977 as a means of predicting an applicant's academic performance in the year following admission. The composite score formulas were revised in 1995 when the examination used was changed from the Secondary School Admissions Test to the ISEE.

to students in the Qualified Applicant Pool according to their composite score rankings. Those students in each school's Qualified Applicant Pool who do not make the initial 50% admissions cut-off at any examination school are designated as that school's "Remaining Qualified Applicant Pool."

The balance of the seats at each school are then awarded according to composite score ranking, together with "flexible racial/ethnic guidelines." These guidelines require that the remaining seats be allocated, according to composite score rank, in proportion to the racial/ethnic composition of that particular school's Remaining Qualified Applicant Pool. Under these guidelines, five demographic categories are identified: black, white, Hispanic, Asian, and Native American. These categories are based on the classifications set forth by the Office for Civil Rights in the U.S. Department of Education.

The flexible racial/ethnic guidelines are designed to provide each school with a student body that reflects the racial and ethnic diversity of that school's Remaining Qualified Applicant Pool. Because the racial/ethnic mix of the Remaining Qualified Applicant Pool will vary from year to year, so too will the racial/ethnic composition of each admitted class.[6]

The Policy includes a sunset clause, requiring the Superintendent to present any recommendations for modifications by December, 1998. It also requires him to request additional resources for the expansion of advanced work classes and summer school programs, as well as for the implementation of tutorial programs, at Boston's elementary and middle schools. These initiatives are designed to improve the performance of Boston Public School students taking the ISEE. Consistent with these initiatives, the Policy requires that all elementary and middle schools set specific goals for increasing the number of sixth and/or eighth grade students taking the ISEE.

In addition, the Policy requires that the examination schools improve their graduation rates. Finally, the Policy requires the Superintendent to present a plan to enhance academic achievement in all of Boston's public high schools.

The Policy was first employed during the 1996 admissions process for students matriculating during the 1997–98 academic year.

## V.

### IMPLEMENTATION FOR THE 1997–98 ACADEMIC YEAR

Under the Policy, the headmaster of each school sets a desired capacity, to which a percentage overage is added. For the 1997–98 school year, the targeted capacity for Boston Latin's ninth grade was 75 students. An overage of 15% was added to that figure, resulting in a potential enrollment of 86 students. That number was increased to 90 students to accommodate Julia McLaughlin, who had been admitted to the Boston Latin by preliminary injunction, as well as the other students who also would have been admitted in 1996–97 had there been no 35% setaside.

In 1996–97, the ninth-grade Boston Latin Applicant Pool consisted of 1409 students. Each was ranked based upon his/her composite score. The top 705 students were designated as the Qualified Applicant Pool (i.e. the top 50th percentile rounded up by one). One-half of the 90 available seats were assigned using straight rank order only, based on composite score and the policy of granting each student's first choice if possible. For the 1997–98 school year, two students among the top-ranked 45 chose an examination school other than Boston Latin as their first choice. As a result, the students that were ranked 1 through 47, who had designated Boston Latin as their first choice, were assigned there. And so, students already assigned to Boston Latin, and any students assigned to Latin Academy or the O'Bryant School as their first choice, were removed from the Qualified Applicant Pool, leaving a Remaining Qualified Applicant Pool of 636 students to compete for Boston Latin's 45 remaining seats.

---

**6.** Boston School Committee member Edwin Melendez added the word "flexible" to the phrase "racial/ethnic guidelines" so as to make clear that the Policy was not a fixed set-aside and did not benefit or burden one particular race/ethnicity.

These remaining seats were assigned to students according to their composite score rankings in numbers proportionate to the racial/ethnic composition of the Remaining Qualified Applicant Pool. For the 1997–98 school year, the demographics of the Remaining Qualified Applicant Pool for Boston Latin's ninth grade were: 27.83% black, 40.41% white, 19.21% Asian, 11.64% Hispanic, and .13% Native American. Accordingly, the remaining 45 seats were offered to thirteen blacks, eighteen whites, nine Asians, and five Hispanics. *See* Table of Admissions, Appendix A.

Sara Wessmann ranked 91st among the applicants to Boston Latin's 90–seat ninth-grade class. Seven students who ranked above her designated examination schools other than Boston Latin as their first choice. Had straight composite score rank order and student preference been applied to all 90 seats, students ranking between 1 and 98 would have been admitted to Boston Latin. But, the applicant of the flexible racial/ethnic guidelines resulted in the rejection of eleven white students with higher composite scores than eight black students, three Hispanic students, and one Asian student who were admitted to Boston Latin. Those eleven white students included Sarah Wessmann.

## VI.

### LEGAL STANDARDS

■ The plaintiff has met her initial burden of going forward in this case by entry of a stipulation. *See* Stipulation, Appendix B. The defendants, therefore, have the burden of producing "a strong basis in evidence" in support of the admissions policy that they have adopted. *McLaughlin,* 938 F.Supp. at 1010. *Accord, Stuart v. Roache,* 951 F.2d 446, 450 (1st Cir.1991), *cert. denied,* 504 U.S. 913, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992). But, the ultimate burden of proof remains with the plaintiff challenging the admissions policy's constitutionality. *See Wygant v. Jackson Board of Education,* 476 U.S. 267, 277–78, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

■ This court's analysis begins with the premise that classifications by race are inher-ently suspect, even when cloaked in the mantle of racial sensitivity and consciousness rather than invidious discrimination. As the Supreme Court has emphasized, "[c]lassifications of citizens based solely on race are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw v. Reno,* 509 U.S. 630, 643, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

■ Racial classifications are presumptively invalid and will be upheld only if they withstand strict scrutiny. To meet the strict scrutiny standard, the challenged racial classification must serve a compelling governmental interest and must be narrowly tailored to achieve that goal. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 224–25, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). "The rationale for this stringent standard of review is plain. Of all the criteria by which men and women can be judged, the most pernicious is that of race." *Podberesky v. Kirwan,* 38 F.3d 147, 152 (4th Cir.1994) (quoting *Maryland Troopers Ass'n. v. Evans,* 993 F.2d 1072, 1076 (4th Cir.1993)). Strict scrutiny, therefore, is the standard that this court will apply in analyzing the plaintiff's challenge to the Policy.

■ At the same time, however, this court is mindful of Justice O'Connor's admonition that strict scrutiny is not to be understood as "strict in theory, but fatal in fact," *Adarand Constructors, Inc.,* 515 U.S. at 237, at well as her further observation that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Id.*

## VII.

### DIVERSITY AS A COMPELLING INTEREST

■ At the core of this case is the government's compelling interest in achieving diversity within the unique context of public intermediate and secondary school education. This litigation is not about the place of diversity in the work place, the market place, or in

graduate education. Here, we are focusing on the obligation of a school district to determine what policies and practices will best prepare its children to succeed in a competitive and diverse society.

The specific question that this court faces is whether the interests of respect for diversity, fairness, and equal access are sufficiently compelling to warrant the Boston School Committee's consideration of race and ethnicity in processing students for admission to one of Boston's three examination schools. And, if the answer to that question is "yes," this court faces the further question of whether the Policy is narrowly tailored to meet that compelling public need.

Public secondary schools are of singular importance "in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests." *Ambach v. Norwick,* 441 U.S. 68, 76, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979). And, consequently these schools are thought to be "the very foundation of good citizenship." *Brown v. Board of Education of Topeka,* 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). More than any other public institution, the public secondary schools awaken our children to cultural values and practices of civility that lead to tolerance and understanding of divergent political, religious, and social convictions.

That unique mission of public secondary schools distinguishes them from other governmental bodies that have instituted race-conscious policies, including other educational institutions such as colleges and graduate schools. Judge Garrity, in the *McLaughlin* case, recognized the fundamental distinction between an urban public school, such as Boston Latin, and the University of Texas Law School, "where the educational mission is so obviously different from that of a public secondary school in a racially diverse municipality." *McLaughlin,* 938 F.Supp. at 1015.

Boston has an ethnically and racially diverse school-age population. Its recent past includes a history of intentional school segregation followed by an ongoing period of tumultuous and painful desegregation. Justice Powell's observation is insightful:

In a pluralistic society such as ours, it is essential that no racial minority feel demeaned or discriminated against and that students of all races learn to play, work, and cooperate with one another in their common pursuits and endeavors.
*Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 242, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (Powell, J., concurring in part, dissenting in part).

■ The Boston School Committee has a compelling governmental interest in adopting a policy that seeks to attain the educational benefits of diversity for its students. Striving for diversity in a secondary school setting does not require the establishment of quotas, nor does it justify the admission of unqualified applicants. Rather, it calls for a conscientious effort to reach out to worthy candidates whose inclusion will enrich the educational experience for *all* who participate. And, it requires an appreciation for the fact that we *all* learn from those whose experiences and points of view differ from our own.

Of great significance is the fact that diversity in the classroom is the most effective of all weapons in challenging stereotypical preconceptions. When studying side by side, in a diverse setting, students grow to understand and respect the differences among them as they share life in a complex, pluralistic society. And, as important, they learn that most people, regardless of their backgrounds, think in fundamentally the same say about matters of character, team work, and mutual respect.

The broad educational dividends of a diverse student body were eloquently articulated by Justice Powell, when he observed, "An otherwise qualified ... student with a particular background—whether it be ethnic, geographic, culturally advantaged or disadvantaged—may bring to a ... school ... experiences, outlooks, and ideas that enrich the training of its student body and better equip its graduates to render with understanding their vital service to humanity." *Regents of the University of California v. Bakke,* 438 U.S. 265, 314, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

At trial, both Superintendent Thomas W. Payzant and Headmaster Michael Contompa-

sis testified as to the potential for academic excellence that exists when a school has a diverse environment. They further testified that respect for diversity and racial/ethnic differences is best taught in a setting that is itself diverse. Particularly instructive on this point is the testimony of Superintendent Payzant:

First of all, the public schools in America have a very important and unique role. When they first began, they weren't for everybody, but, clearly, as the 20th century has progressed, they've become the schools for everybody. And, if you look at the school-age population nationwide, despite all that we hear about the numbers of students leaving the public schools, they still educate between 88 and 90% of the school-age population in this country. They've been the schools they have brought students from all walks of life—immigrant students from around the world—to a place where they could get an education that would prepare them to go on to post-secondary education, into the world of work and be able, as adults, to function as citizens in their communities, to keep the democracy vibrant, and to address quality of life issues.

What we've seen over the years are dramatic changes in demographics, not just in our major cities, where those changes came first, but in other communities as well. The children who are in our public schools today are a more diverse group than they were 25 years ago.

But the real point is that they're going to be in work places, in communities, and in neighborhoods, that are increasingly diverse, and they've got to be well-grounded in understanding, experience, and acceptance of what it is like to bring a different perspective from a different cultural background, a different racial background. [They must also] understand the similarities that all human beings bring, regardless of their race and cultural background so that they [can] function well in their communities, their work places, and their social interactions—in their responsibilities as citizens.

And unless the public schools, all of the public schools, not only address diversity in terms of teaching about it, but exposing children to the real experience of [attending] school with those from different racial and cultural backgrounds, we won't be fulfilling the promise and the opportunity that is at the heart of public education in America.

Diversity encourages and broadens the educational experience through encounters with others of different backgrounds, both inside and outside of the classroom. As noted by the Supreme Court:

"A great deal of learning occurs informally. . . . In the nature of things, it is hard to know how, and when, and even if, this informal 'learning through diversity' actually occurs. It does not occur for everyone. For many, however, the unplanned, casual encounters with roommates, fellow sufferers in an organic chemistry class, student workers in the library, teammates on a basketball squad, or other participants in class affairs or student government can be subtle and yet powerful sources of improved understanding and personal growth."

*Bakke,* 438 U.S. at 312–13 n. 48 (quoting the President of Princeton University).

Relying heavily on the Fifth Circuit's decision in *Hopwood v. State of Texas,* 78 F.3d 932 (5th Cir.), *reh'g en banc denied,* 84 F.3d 720 (5th Cir.), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996) (finding that the state's interest in diversity at a law school was not compelling and declaring that school's admissions policy, which employed racial classifications, unconstitutional), the plaintiff argues that diversity is not a compelling governmental interest. This court disagrees.

There is no Supreme Court decision that has held that diversity is not a compelling state interest in the context of intermediate and secondary public school education. *See Hunter v. Regents of the University of California,* 971 F.Supp. 1316, 1325 (C.D.Cal.1997) (stating that "no majority of the [Supreme] Court has ever explicitly held that remedial action may constitute the only valid compelling state interest"); *Wittmer v. Peters,* 87

F.3d 916, 919 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 949, 136 L.Ed.2d 837 (1997) (commenting that "[a] judge would be unreasonable to conclude that no other consideration except a history of discrimination could ever warrant a discriminatory measure unless every other consideration had been presented to and rejected by him"); *see also Wygant,* 476 U.S. at 286 (O'Connor, J., concurring) (adding that "although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support the use of racial considerations in furthering that interest"). Moreover, the Fifth Circuit's conclusion in *Hopwood* that diversity may never· be considered a compelling governmental interest has drawn sharp and intense criticism. *See, e.g., Hopwood,* 78 F.3d at 964 (Wiener, J., concurring) (stating that, "[i]f *Bakke* is to be declared dead, the Supreme Court, not a three-judge panel of a circuit court, should make that pronouncement"); *Hopwood v. State of Texas,* 84 F.3d 720, 722 (1996) (Politz, C.J., and King, J., Wiener, J., Benavides, J., Stewart, J., Parker, J. and Dennis, J., dissenting from the decision to deny rehearing en banc) (noting that the lower federal courts "are compelled to follow faithfully a directly controlling Supreme Court precedent unless and until the Supreme Court itself determines to overrule it"). Dissenting from the decision to deny rehearing *en banc,* seven judges of the Fifth Circuit stated that Justice Powell's opinion in *Bakke,* which was joined in part by four other Justices, "made the Supreme Court's disposition precedential." *Hopwood,* 84 F.3d at 724. This Court is not bound by *Hopwood,* and does not regard it as persuasive precedent on the issue of whether diversity in a public intermediate and secondary school setting is a compelling governmental interest.

Similarly, this court does not regard the Supreme Court's decision in *Adarand,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, or *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), as prohibiting it from considering diversity to be a compelling interest in the setting of a public secondary school such as Boston Latin. Those two cases dealt with regulations awarding municipal and federal construction contracts, and not with the authority of a school committee to make student assignments on the combined criteria of academic achievement and racial/ethnic sensitivity. Moreover, as the dissent in *Hopwood* pointed out, the Supreme Court has held that, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484–85, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (cited in *Hopwood,* 84 F.3d at 722).

Here, the Boston School Committee's interest in affording Boston Latin students the educational opportunities inherent in a diverse setting is most compelling. Diversity avoids the predictably adverse consequences of racial and ethnic isolation. Moreover, diversity can be an important factor contributing to students' intellectual and moral development, thereby preparing them to survive and thrive in a pluralistic society.

The Boston School Committee has designed an admissions policy that provides Boston Latin with academically qualified young men and women from a cross-section of neighborhoods and socioeconomic levels. The diversity that the Policy achieves is quantifiable. It reflects the racial/ethnic composition of Boston Latin's Remaining Qualified Applicant Pool.

The Policy is not just another paternalistic affirmative action program against which Justice Thomas admonished in *Adarand:*

> These programs not only raise grave constitutional questions, they also undermine the moral basis of the equal protection principle.... [T]here can be no doubt that racial paternalism and its unintended consequences can be as poisonous and pernicious as any other form of discrimination.

*Adarand,* 515 U.S. at 240–41 (Thomas, J., concurring in part, concurring in the judgment). To the contrary, the Policy embodies an achievement-driven admissions plan whose goal is the attainment of academic

excellence. *All* students must be in the Qualified Applicant Pool to even be considered for admission. *All* students are admitted from the Remaining Qualified Applicant Pool in rank order, subject only to application of the flexible racial/ethnic guidelines. There is no predetermined set-aside for any racial or ethnic group. Merit selection is the core value of the Policy.

## VIII.

### *VESTIGES OF PRIOR DISCRIMINATION*

■ Despite more than a quarter century of federal court involvement, vestiges of past discrimination remain within the Boston Public School system. A manifestation of that reality is Judge Garrity's injunctive order, which permanently bars the Boston School Committee from "creating, promoting, or maintaining racial segregation in any school." Order, at p. 5. This order was reissued by Judge Garrity in July of 1994 and is a mandate that must be obeyed by the Boston School Committee until it is either amended or withdrawn by the court. This order alone provided a compelling basis for the Boston School Committee's adopting a policy designed to effectively avoid re-segregation of its examination schools.

On that point, as well, the Boston School Committee was mindful of the warning proffered by Judge Garrity in *McLaughlin* as he revoked the 35% set-aside:

> It would seem to follow that abandonment of the 35% set-aside at the present time without adopting other remedial measures would, within the next six years or sooner, convert BLS into an overwhelmingly white and Asian–American school with a black and Hispanic enrollment of about 15%. It would also impact district middle schools ... converting several of them into overwhelmingly black and Hispanic schools. By such a change, the systemwide *de jure* segregation of the 1970's would probably be succeeded, at least in the middle

schools, by runaway *de facto* segregation in the 1990's and beyond.

*McLaughlin,* 938 F.Supp. at 1008.

The overwhelming evidence presented at trial confirmed the Boston School Committee's basis for concluding that remedial action was necessary to avoid the *de facto* segregation that Judge Garrity had warned against. The defendants presented evidence of gross disparities in achievement and admissions statics between black and Hispanic students on the one hand, and white and Asian students on the other. Notwithstanding extensive court involvement following the 1974 desegregation orders, there continues to be a failure to close the achievement, admissions and allocation of resources gaps, and to set uniform curriculum standards for all students. Moreover, it is apparent that, too often, teachers harbor lower performance expectations of black and Hispanic students.

There was certainly an adequate factual basis for the Boston School Committee to determine that a compelling need for remediation existed. Indeed, a failure by the Boston School Committee to recognize that need would have been a serious dereliction of its responsibility, as well as a violation of Judge Garrity's order. The Boston School Committee's remedial action—the implementation of an achievement-driven, flexible, race-conscious admissions policy with a three-year review window—appropriately addressed the vestiges of discrimination that linger in the Boston Public School system.[7]

## IX.

### *NARROW TAILORING*

■ The Policy was the product of a responsible and thorough decision-making process, which included: (1) an internal staff review of admissions options; (2) a study by Bain, analyzing sixteen possible admissions alternatives; (3) the establishment of a Task Force with important substantive responsibilities; (4) numerous public meetings and forums conducted by the Boston School Com-

---

7. The court notes that these vestiges were testified to not only by the defendants' witnesses, Janice Jackson and Robert Gittens, but also on cross-examination by the plaintiff's expert, Stephen Thermstrom, on February 20, 1998. This court accepts and adopts that testimony and rejects any to the contrary.

mittee; (5) the analysis and recommendation of the Superintendent; and (6) final consideration and adoption by the Boston School Committee.

Among the topics discussed during the decision-making process, exclusive of race/ethnicity, were: (1) the role that merit, socioeconomic status, and years of attendance in the Boston Public Schools should play in the admissions process; (2) the need for increasing support for ISEE test preparation; (3) the possibility of considering subjective student applicant information, including essays, recommendations, and interviews; (4) the feasibility of admission by lottery; and (5) the effect of adjusting the composite score formula.

From this discussion, several options emerged as alternatives to a race-conscious admissions policy. Ultimately, the Boston School Committee adopted the Task Force's view that such options would not adequately meet the stated goals of excellence, access, fairness, and respect for diversity. While the court realizes that alternatives based on factors other than race/ethnicity could, in the long-term, narrow the achievement gap between races and achieve increased diversity, it finds that the Boston School Committee justifiably determined that immediate action was necessary to avoid *de facto* segregation.

The court further finds that the Policy is narrowly tailored. Specifically, the Policy admits only highly qualified applicants. Indeed, the students admitted to Boston Latin's ninth grade for the 1997–98 school year all ranked within the top 10.6% of the Applicant Pool.[8] In short, it is an achievement-driven Policy.

The Policy is also limited in time. It has a built-in review provision, requiring the Su-

perintendent to present findings and recommendations for modifications to the Boston School Committee no later than December, 1998. This sunset clause ensures that the Policy will not outlive the examination schools' current compelling need for it.

Significantly, the Policy is flexible. The racial and ethnic composition of the Applicant Pool, the Qualified Applicant Pool, and the Remaining Qualified Applicant Pool will, undoubtedly, change from year to year. Such flexibility ensures that the Policy is continually re-tailored to reflect the diversity of each year's Remaining Qualified Applicant Pool. It does not, therefore, benefit or burden any one race or ethnicity.[9]

## X.

### *CONCLUSION*

All of these factors, singly and collectively, support this court's finding that the achievement of diversity in the context of the public secondary school education provided at Boston Latin constitutes a compelling governmental interest. Further, this court finds that the defendants' policy for admission to Boston's examination schools is narrowly tailored to meet that compelling interest, as well as the state's compelling interest in overcoming the vestiges of past discrimination and avoiding the re-segregation of the Boston Public Schools. The Policy is achievement-driven and racially/ethnically conscious. It provides flexible guidelines to ensure academic excellence in a diverse setting.

Plaintiff's contentions to the contrary are rejected by the court, and judgment will be entered for the defendants.

AN ORDER WILL ISSUE.

### *APPENDIX A*

For the 1997–98 school year, ninth grade students were admitted to Boston Latin as follows:

---

**8.** Notably, the plaintiff's composite score was 116.351, a mere 3.968 points more than that of the lowest admitted student. This court is persuaded by Dr. Hambleton's testimony that this narrow difference is of no statistical significance when predicting future success based on composite score.

**9.** In fact, the flexible racial/ethnic guidelines, as used in the admissions process for O'Bryant's ninth-grade class, resulted in the non-admission of two Hispanic student applicants who had higher composite scores than a white student applicant who was admitted.

| | Total | Black | White | Asian | Hispanic | Nat. American |
|---|---|---|---|---|---|---|
| Total Applicant Pool | 1409 | 565 (40.10%) | 413 (29.31%) | 232 (16.47%) | 194 (13.77%) | 15 (0.35%) |
| Eligible | 705 | 198 (28.09%) | 280 (39.72%) | 145 (20.57%) | 80 (11.35%) | 2 (0.28%) |
| First 45 Seats | 45 | 6 (13.33%) | 22 (48.89%) | 13 (28.89%) | 4 (8.89%) | 0 (0.00%) |
| Remaining Qualified Applicant Pool | 636 | 177 (27.83%) | 257 (40.41%) | 126 (19.81%) | 74 (11.64%) | 2 (0.31%) |
| Second 45 Seats | 45 | 13 (28.89%) | 18 (40.00%) | 9 (20.00%) | 5 (11.11%) | 0 (0.00%) |

### APPENDIX B

The stipulation:

1. The exam school admission policy adopted on December 18, 1996 provides for the application of "flexible racial/ethnic guidelines" to the remaining qualified applicant pool. On the basis of her rank of 91, Sarah Wessmann was in remaining qualified applicant pool.

2. If the School Committee had adopted a policy whereby admission was based solely on a ranking of composite score, and if, in implementing the policy, the composite score was derived in the same manner and used the same weights as were used in applying the policy for the 1997–98 school year, and if the number, ranking and choices of students ranked above Sarah Wessmann on the list remained the same, Sarah Wessmann would have been admitted to Boston Latin School for the school year 1997–98 with a rank order of 91.